# SUPPLEMENT.

## OPINION OF THE JUSTICES TO THE GOVERNOR AND COUNCIL.

Under the St. of 1887, *c.* 437, persons who served in the army or navy of the United States in the time of the war of the Rebellion, and were honorably discharged therefrom, cannot be preferred for appointment to office or employment in the service of the Commonwealth or the cities thereof, without having made application for appointment to office or employment to the civil service commissioners, as required by the St. of 1884, *c.* 320, and the rules of the civil service commissioners made thereunder.

THE following order was passed by the Governor and Council on July 20, 1887, and transmitted on the following day to the Justices of the Supreme Judicial Court, who on September 22, 1887, returned the answer which is subjoined.

Whereas, the civil service commissioners have prepared and submitted to the Governor and Council for approval, pursuant to section 2 of chapter 320 of the Acts of the Legislature for 1884, the following additional Civil Service Rule:

## "AMENDMENT OF RULES.

"Clause 1. Any person who served in the army or navy of the United States in the time of the war of the Rebellion, and was honorably discharged therefrom, desiring, under chapter 437 of the Acts of 1887, appointment to office or employment in positions classified under the civil service rules, without having passed any examination provided for therein, shall file an application for such appointment, stating on oath, — 1. His name, residence, and post-office address. 2. The office or employment he seeks. 3. The time of service in the army or navy; the regiment and company in which, or the vessel on which, such service was rendered; and the date of his discharge. 4. Whether the applicant habitually uses intoxicating beverages to excess, or is a vender of intoxicating liquor. 5. Whether

he has within one year been convicted of any offence against the laws of the Commonwealth. 6. That he desires appointment or employment without having passed the examination provided for by the civil service rules.

" Such application shall be accompanied by certificates of good moral character and capacity for performance of the duties of the office or employment.

" Such application, if for an office or employment in the service of the Commonwealth, or the city of Boston, shall be filed in the office of the commissioners ; if for an office or employment in the service of any other city than Boston, it shall be filed with the civil service examiners for such city. Such applicant, if he expresses a desire not to pass the examination provided for by the civil service rules, shall be exempt therefrom.

" Clause 2. When requisition is made by an appointing officer upon the commissioners for names of eligible persons for appointment to office or employment in the public service, the commissioners shall certify the names of those most eligible on the proper register, as provided for by the civil service rules, and in addition shall, when so requested by the appointing officer, report the names of any honorably discharged soldiers or sailors of the war of the Rebellion, who have filed proper and true applications for appointment to such office without examination. The appointing officer can appoint from the list of names so certified or reported to him."

And whereas, the question of the approval of said civil service rule is now before the Governor and Council, and they wish to be advised as to its legality under chapter 437, of the Acts of the Legislature for 1887,

It is therefore ordered that the opinion of the Justices of the Supreme Judicial Court be required upon the following important questions of law :

First. Under chapter 437 of the Acts of the Legislature of 1887, can persons who served in the army or navy of the United States in the time of the Rebellion, and were honorably discharged therefrom, be preferred for appointment to office or employment in the service of the Commonwealth, or the cities thereof, without having made application for appointment to

office or employment to the civil service commissioners, as required by chapter 320 of the Acts of the Legislature for 1884, and the rules of the civil service commissioners made thereunder ?

Second. Will the proposed civil service rule, set forth as above, if approved by the Governor and Council, be valid ?

To His Excellency the Governor and the Honorable Council of the Commonwealth of Massachusetts :

The undersigned, Justices of the Supreme Judicial Court, having considered the questions upon which their opinion is required by the Governor and Council, respectfully submit the following opinion :

The statute of 1887, chapter 437, provides that "all persons who served in the army or navy of the United States in the time of the war of the Rebellion, and were honorably discharged therefrom, may be preferred for appointment to office or employment in the service of the Commonwealth, or the cities thereof, without having passed any examination provided for by chapter three hundred and twenty of the Acts of the year eighteen hundred and eighty-four, or by the rules of the civil service commission made under the provisions of said act. Age, loss of limb, or other physical impairment, which shall not in fact incapacitate, shall not be deemed cause to disqualify under this act. But nothing herein contained shall be construed to prevent such persons from making application for such examination, or from taking such examination, provided they were entitled to do so under the rules of said commission."

It seems to us that this statute was intended to be an amendment of the statute of 1884, chapter 320, usually called the civil service law, the main purpose being to exempt honorably discharged soldiers and sailors from the examination required by that law and the rules established under it, leaving them subject to the operation of the law except so far as exempted by the amending act. This is the natural and obvious meaning of the act of 1887. If the Legislature had intended to provide that soldiers and sailors should be exempted from the operation of the civil service law, it is to be presumed that it would have said so in direct and explicit language, as is done in the fifteenth section of the act of 1884, where it is provided that

certain classes of officers "shall not be affected, as to their election or selection, by any of the rules made as aforesaid."

The statute of 1887 does not provide that soldiers and sailors may be appointed to office or employment without making application to the civil service commissioners. On the contrary, the structure of the act shows that it was intended to be engrafted upon and to become a part of the act of 1884, for the regulation of the civil service. The language used is, "may be preferred for appointment to office or employment," which implies that they are to be selected out of a list or number of applicants, and plainly refers to the fourteenth section of the civil service law, providing for giving preference to soldiers and sailors.

The provision that " age, loss of limb, or other physical impairment, which shall not in fact incapacitate, shall not be deemed cause to disqualify under this act," implies that soldiers and sailors were to remain subject to the civil service law, except so far as expressly exempted by this act. This provision would be entirely useless if the purpose of the preceding clause was to take the appointment of soldiers and sailors out of the jurisdiction and supervision of the commissioners. Considered as a part of the civil service law it has force and effect, because it exempts soldiers and sailors from the operation of the rules of the commissioners, making in certain cases the age of the applicant a disqualification, and limits the power of the commissioners to make any rules, in the future, which are inconsistent with it.

The civil service law made a radical change in the method of appointing such officers and servants as are within its scope. Its scheme is that all such appointments should be under the supervision of the civil service commissioners, who are to determine the qualifications of the applicants for the offices or employment which they seek. The statute does not attempt to fully define the qualifications of such officers and servants, but it confers upon the commissioners the authority to make rules, not inconsistent with law, for their selection and appointment, which rules, when approved by the Governor and Council, have the force of laws, and are binding upon the appointing officers.

The statute and the rules made under it establish certain requirements or conditions, which must be complied with before

an appointment will be made. Thus, among other things, it is required that an application must be made to the civil service commissioners, stating certain facts as to the name, age, residence, and previous history of the applicant; it is also provided that no person shall be appointed who is a vender of intoxicating liquor, or who habitually uses intoxicating beverages to excess, or who within one year preceding his application has been convicted of any offence against the laws of this Commonwealth, and that certain officers shall be appointed for a probationary period. The rules, following the directions of the statute, further make specific and minute provisions for the personal examination of the applicant, designed as a test of his attainments and proficiency in the department of knowledge deemed necessary for his fitness for the position which he seeks.

The examination of the applicant is an important requirement of the statute, and of the rules, but it is not the only material requirement. It cannot justly be said that the other requirements to which we have referred are parts or incidents of the examination. They are separate and independent requirements or conditions, and are so treated throughout the statute and the rules. The Legislature, in enacting the statute of 1887, had in mind the civil service law and the rules of the commissioners; the provision that soldiers and sailors " may be preferred for appointment to office or employment in the service of the Commonwealth, or the cities thereof, without having passed any examination provided for " by such law and rules, according to the natural import of the words used, refers to the personal examination provided for by the statute and rules. It cannot be held to repeal the statute of 1884 so far as it relates to soldiers and sailors, or to exempt them from the other requirements of the statute and rules, without greatly enlarging the language of the Legislature.

We are therefore of opinion, in answer to the first question proposed, that, under chapter 437 of the Acts of the Legislature of 1887, persons who served in the army or navy of the United States in the time of the Rebellion, and were honorably discharged therefrom, cannot be preferred for appointment to office or employment in the service of the Commonwealth, or the cities thereof, without having made application for appointment to

office or employment to the civil service commissioners, as required by chapter 320 of the Acts of the Legislature of 1884 and the rules of the civil service commissioners made thereunder.

The second question is general, and points out no particular question of law upon which our opinion is desired.

We have doubts whether, within the fair intent of the Constitution, the executive or legislative departments can submit to the Justices a law, or a series of laws or rules more or less complicated, and ask them to examine and ascertain what questions can be raised as to the validity of every clause, and to express an opinion in advance upon every such question. The practice always has been for the Justices to confine their answer to the particular questions of law submitted to them. As the order of the Governor and Council points out no definite question except the one we have answered, we have considered no other. If we were to suggest questions which might arise as to the validity of parts of the rule proposed by the commissioners, and to express an opinion upon them, it would be going beyond our proper duty, and might be regarded as an interference with the independence of the executive department.

Mr. Justice Devens does not concur in this opinion, and requests us to state that in his view the statute of 1887, chapter 437, in providing that the soldiers and sailors therein described may be preferred for appointment without having passed any examination provided for by the civil service act, or the rules of the civil service commissioners made under the provisions of said act, exempts them from any investigation by the civil service commissioners of their qualifications, and leaves them to be determined by the power competent to appoint, and that they are thus necessarily exempted from making application for appointment to the civil service commissioners.

MARCUS MORTON.

WALBRIDGE A. FIELD.

WILLIAM ALLEN.

CHARLES ALLEN.

OLIVER WENDELL HOLMES, JR.

MARCUS P. KNOWLTON.

Boston, September 22, 1887.

THE Honorable AUGUSTUS LORD SOULE, a Justice of this Court from the twenty-seventh day of March, 1877, to the eleventh day of April, 1881, died at Franconia, New Hampshire, on the twenty-fifth day of August, 1887. A meeting of the members of the Hampden Bar was held in Springfield on the twenty-second day of the following September, at which the following resolutions were passed, which were presented to the full court on the twenty-seventh day of the same month.

Resolved, That in the death of the Honorable Augustus L. Soule, a former member of this bar, and an ex-Associate Justice of this Court, the bar and the community suffer the loss of an excellent, eminent, and honorable practitioner; a just, generous, and upright man; one who dignified and adorned each and every station he was called to occupy; who illustrated the practice of his profession with fairness, courtesy, and grace; who evaded the littlenesses of law and of life. Jealous of the honor of the profession, he believed in the maintenance of its amenities as well as its dignities. A quiet, steadfast, and reliable friend, allegiance to the right was his characteristic. An honorable citizen, an accomplished lawyer, a dignified, courteous, able, and upright judge, his memory remains to us an inheritance and an example.

Resolved, That these resolutions be presented to the Honorable the Supreme Judicial Court, that they may be placed upon record, and a copy thereof be transmitted by the clerk to the family of Mr. Soule, in token of our earnest sympathy with them in their loss.

Edward H. Lathrop, Esq., in presenting the resolutions, addressed the court as follows:

These resolutions typify and illustrate in a measure, perhaps, the feelings of the bar toward Mr. Soule, — this bar where he started out in his profession, and where he had fought his way upward to a highly successful and honorable practice. Few men knew Mr. Soule as we did. The revelation of himself to the multitude was rare. Conscious of his own strength and limitations,

there yet was always in him a desire to be of and among the people. He made little noise in his career up to where he attained the distinction of yourselves. It is true, perhaps, that contact with other and jury tribunals was not to his taste. The chosen arena of his efforts was before the bar of this court. He loved the seclusion and dignity and strength of the Supreme Court. He was a constant and appreciative friend and man. His desire and enthusiasm for the advancement of the younger members of the bar was ever quietly, watchfully manifested; for he knew well what it was to struggle for professional existence. Always, in the office and as a citizen, did he identify himself with the advancement of the people's interests. I need not enlarge upon his personal characteristics. You know them well. It only remains for me to move that these resolutions be made a part of the record of this court.

The Hon. George M. Stearns then addressed the court as follows:

The death of one who for nearly forty years was a member of this bar, who represented this city in the Legislature of the State, and who was an Associate Justice of this court, appears a proper occasion for us to ask your Honors to pause in the transaction of the business of this court, and to join with us in an affectionate tribute of respect to Mr. Soule.

As I look about me, I see no one whose recollections of Brother Soule were earlier than mine. When I was a student in the office of the late Mr. Justice Wells of Chicopee, coming there in 1848, Mr. Soule became a student in the office of George Walker. Our offices were but a few steps apart. I soon became an intimate acquaintance of his, and enjoyed the freedom and frankness which the companionship of youth affords. He was then a witty, a genial, and a most confidential companion and friend; and although generally deemed to be haughty and almost defiant in manner, I have never met any one who more readily laid bare his bosom, or more fully exposed his emotions and purposes to those in whom he trusted and confided.

As a lawyer, I think he presents a most wonderful phase of our profession. He was keen, peering, incisive, thorough in detail, searching, and able. He had the most wonderful agility, it

always seemed to me, for it was my lot to meet him in the vehement combats which we professional men enter upon so often as much as any other man.   I was always surprised with the alertness of the man.   No case was so strong that we felt sure it was safe, when Brother Soule was on the other side.   If we rushed on him with a case apparently invincible, he stepped aside and gave us a wound as we swept by.   I recollect well the first case we ever had, and I speak of it as illustrating somewhat his ability and the character of the man.   We were both of us students, and both of us ambitious to try cases, — an ambition of which most of us of my age have been happily cured.   I brought a case before George Walker.   Lawyers then brought cases before one another as justices of the peace.   I supposed there was no defence.   To my surprise, when I went over to Mr. Walker's office to ask for an execution, he told me Mr. Soule had appeared and filed a plea in abatement.   I examined the papers in the case, and found there a plea in abatement drawn out in faultless form, with the summons duly enrolled.   The point was that the summons was dated in June, and was returnable on the 13th day of July, and did not express what July, the word "next" having been omitted in the haste of writing.   We argued the case before Mr. Walker, Brother Soule arguing that it was necessary that it should appear certainly what July was meant, as the writ must be returnable within sixty days from its date, and it was not legally certain that this writ was so returnable.   Mr. Walker decided to sustain the plea, and ordered the suit abated.   I was mildly enraged at the decision, as I have been sometimes since at the decisions of other tribunals.   I appealed, but before the case came to trial Brother Soule became satisfied that the broader principles of our jurisprudence would not sustain this New Hampshire technicality.

He was a powerful antagonist.   As I have said, we never knew when we were safe, and never until the jury were locked up were we quite certain that we knew the worst.   He exhausted his adversary's case by tapping the veins over the body of it, rather than by any brutal assault upon the jugular, or any savage cuts of the femoral arteries.   He did not like a jury trial, and a jury trial did not like him.   He could not get down to the jury.   He had not the knack of sitting on the milking-stool

of the farmer, or of handling the oil-can with the mechanic, or of flecking himself with cotton with the mill hand, and he could not avoid his manner betraying the loftier conceptions he had of a case. Consequently, he always sought for exceptions, and most wonderfully astute and keen was he in attaining that valuable weapon, a good exception. I may truly say, in remembering the many contests I have had with him and the many remarkable questions and points which he raised that never occurred to me or any other member of the bar, that he was the Christopher Columbus of this bar in matters of law, — discovering not only legal continents, but the minute and unknown islands that dot the coast. He said to me the last time I saw him in this court-house, that he hoped he might never be obliged to try another jury case. He loved to argue cases before this court, he loved the Supreme Court and discussions before it. He said that when he was beaten here, he knew there was a reason for it.

As an office lawyer, and in the position which he occupied in later years, I think he was unsurpassed. In counsel he was clear and cool, and balanced and fair, and in the preparation of instruments, of documents, of contracts, and of bills before the Legislature, I never have met with his equal. As a judge of this court he seemed to us to be nearly perfect. He was dignified and fair, and quick and strong. As a citizen, he was honorable and noble and true; as a husband and father and as a friend, he was blameless.

The Hon. George D. Robinson then addressed the court as follows:

May it please your Honors: When I came to the bar in this county, Mr. Soule was in the full vigor and forceful exercise of his high powers of manhood. He stood out as a man of large capacity, and of varied and accurate learning. Cultured, keen, clear-sighted, frank, earnest, equipped in the learning of the profession, he impressed me as the possessor of rare natural gifts, and as a master in the difficult and abstruse questions of the law. He was at the time associated with Judge Wells, and the subsequent career of the two members of that firm, and of some whose course of professional studies they directed, by example

as well as by precept, demonstrates the quality of greatness, of scrupulous honor, and of scholarly attainments that impressed itself into the character and standing of that office.

I am well aware that it has sometimes been said of Mr. Soule that he was cold, haughty, and distant, and that he seemed to have little sympathy with the every-day people about him. But I am sure it was only in the exterior of the man that one could discover such a characteristic. Deeper than the expression of manner, his heart was full of generosity and kindness, and one needed but to know him thoroughly and intimately to find a warm, loyal, and confiding nature, enriching and ennobling his life. I shall never forget my earliest acquaintance with him in the court-room. He was but a stranger to me. His position at the bar was assured and recognized. My effort was but the halting and uncertain struggle with questions which no experience had taught me to solve. I had made a motion in court which seemed to me so clearly just and proper, that I doubt not my countenance revealed my deep disappointment when the presiding justice, justly convinced, no doubt, by the superior wisdom and experience of my opponent, denied my application. As I turned away Mr. Soule made a jocose remark to me, and said : " Never mind, Robinson, don't let that discourage you. You'll come out all right by and by." To a young man such encouragement and cheer are of immeasurable aid, and the older practitioner who speaks such words out of a warm and sympathetic heart has done very much to make a life of success and honor far more probable than one of misfortune and failure. And such kindliness of bearing was not exceptional with him. Others have profited again and again by the helpfulness of his suggestions, and bear unhesitating testimony to the generous qualities as well as the excellent abilities of this accomplished lawyer, this refined scholar, this courteous gentleman.

In later years we knew him as Judge Soule, a Justice of the Supreme Judicial Court of the Commonwealth. You who were his associates must have highly appreciated the maturity of power, the strength and clearness of judgment, and the unwavering sense of justice, with which he participated in the deliberations of the court. We who placed our causes before him for

his consideration and determination were assured that he never forgot what was due from him as a man and as a judge. We never doubted that his judgments were always the result of his honest convictions. He who at the bar had waged warfare on the highest plane of professional honor, above the meanness of tricks and deception, who claimed no advantage through favoritism and won no victory by questionable practices, who could entertain no respect for any court, high or low, that was not pure and incorruptible, — he never lowered in the slightest degree the dignity and character of this honorable court, or disturbed the confidence of the people in the integrity and fairness of its judgments. Personal favor exercised no control or influence in his conclusions. He passed upon the causes, not the suitors, that came before him. He was ever actuated by the spirit of the legend of this court, *Nulli vendemus, nulli negabimus, justitiam.*

When a judge so able and upright dies, when an accomplished lawyer and gifted scholar passes beyond the vail, when the clean-handed and honorable gentleman whom we all knew, goes forever from our sight, his memory is our precious possession, and his character remains to inspire and uplift. I am sure, may it please your Honors, that the sentiments of the resolutions which have been offered are in cordial accord with the feelings of the members of this bar, and I trust that they may be adopted and written upon the records of the court.

All that was mortal of our departed friend and associate moulders in the soil of his native town and State; but his standing and character as a lawyer, as a judge, and as a man, all that he was to this court and to this community, are imperishable, and will be held in grateful remembrance and jealous regard.

Frederick H. Gillett, Esq., addressed the court as follows:

May it please your Honors: The same reasons which probably influenced the bar in assigning me to the committee on resolutions make it, I think, proper that I should add a word of appreciation of Judge Soule. I knew him only in his later life, from the time when he resigned his seat as your Honors' associate and then invited me to become his partner. I had indeed then known him for years in that casual intercourse

which often develops into friendship, yet in me he had awakened — and it was perhaps characteristic of the man — no feeling less formal than respect. I was taken at once, necessarily, into his intimacy and confidence, and my cold acquaintance developed into a warm admiration and personal affection, which increased until his death.

I imagine it is often true, on the principle *Omne ignotum pro magnifico*, that a senior partner appears to his junior in less grand proportions than to the world at large. Certainly, as far as concerns strength and keenness of intellect, delicacy of moral fibre, and geniality and even joviality of disposition, the very reverse of this was true of Judge Soule. The more I witnessed the workings of his mind, the more I admired its native force and its trained dexterity. There were constantly recurring instances of the quick penetration and strong grasp with which he instantly seized the vital elements of a case, the acute discrimination with which he compared and weighed balancing and contradictory phases, distinguishing closely and refining deeply, but controlling all his processes by a masterful common sense. He leaped quickly, often instantaneously, to his conclusions, and was confident in upholding them; but it was confidence in an eye that could see clearly where most would grope in a haze. This, to my mind, was his chief distinction, — a strong, clear mental vision, which pierced easily into obscurity, and saw objects in their true proportions and perspective. I should characterize him as more strong than profound, more sagacious than learned, more quick and penetrating than exhaustive; a man with a brain of the very first quality, disciplined into instant obedience.

The law was to him a profession, never a trade. He was scrupulously careful that his opinions should be correct, though he was never anxious; and I sometimes fancied his sensitiveness in this regard was a relic of his judicial experience, a sort of feeling of *noblesse oblige*, and that his solicitude that his decision should be right when it was only the opinion of a lawyer was akin to that sense of responsibility which must weigh upon every one whose words are *ipso facto* law. If in the conduct of a case the thought what course would best promote his selfish interest ever entered his mind, I am sure it never governed his

action. He scorned low ends, and base methods, and dishonorable weapons, and would never affect to conceal his scorn. Indeed, his contempt for finesse, and artifice, and indirection, extended to the milder and more innocent methods of winning popularity and success; and he would never seek so to ingratiate himself that "thrift may follow fawning."

I went to him immediately from a similar association with one whom your Honors and the whole bar of Massachusetts knew and honored, the late George Marston, and it may not be unduly personal or out of the line of this occasion to suggest the singular contrast their characteristics and careers present, honorable alike to both. Both were endowed with unusual abilities. The life of one opened on the sands of Cape Cod, where modern ideas make slowest headway, and he had for early culture only the advantages which our remotest district offers to all her children; the other was born in the very groves of the academy, surrounded by the most fastidious culture, and reared in a constant atmosphere of refined scholarship. Not improbably the earnest, practical struggle with life of the one broadened his sympathies, while it tended, perhaps, to blunt sensibilities; as the studious seclusion of the other tended to dull at least the expression of general sympathies, while it quickened sensitiveness. One started in his profession with mind and faculties completely equipped, with all the polished weapons education could furnish, but needed clients; the other in his upward progress had won friends and clients, but needed erudition. Both found what they needed in full measure, and it seems to me their prosperous careers and the goals which they attained were exactly what a scientific forecast would have indicated, and exemplify the influence of environment, one becoming the Attorney General, the other the Justice, one dealing with and mastering facts and men, the other principles and abstractions.

Where in Judge Soule's career his faculties found their most useful and congenial sphere, I will not presume to determine; but if it was true of him, as it is in general of us all, that what we enjoy doing we do well, then I am confident that his association with your Honors was his most successful field, for I have heard him speak of the deliberations and discussions and displays of intellectual strength in the consultation room with a

zest and warmth and enthusiastic admiration which I never knew him to exhibit toward any other forum of the profession.

His private life was pure and his morals were irreproachable. While he did not wear his heart upon his sleeve, he was in the unrestrained society of his friends a most delightful companion. Cordial, hearty, fond of fun, enjoying a joke, even at his own expense, quick at repartee and quotation and allusion, bright and witty, — not a wit that sparkled coldly without warming your good will, but a genial humor that while it entertained you drew you into closer fellowship with him, — in his society you always knew that no witticism was too subtle, no allusion too recondite, no humor too lively, no discussion too deep or too wide for his appreciation. And beneath all was a warm heart beating with ready sympathy. I never found a draft upon his kindness dishonored; and, while I deplore the public loss, I mourn most deeply the true, affectionate, warm-hearted friend.

Chief Justice Morton responded as follows:

Brethren of the Bar: We receive with the deepest sensibility your tributes of respect and affection to our deceased associate and friend, Judge Soule. The death of such a man, in the midst of useful and honorable work, in the full maturity of his powers, before age has weakened his faculties or impaired his capacity for useful labor, is of itself a solemn and impressive event. But this afflictive event is made more impressive and significant to us from the fact that in late years we have been so frequently called upon to deplore the loss of those associated with us in our duties. In the last five years during which I. have been Chief Justice, we have lost by death or by sickness six of those who have served as Justices of this court, only one of whom had reached the age of threescore years and ten.

This is not an occasion on which to attempt an elaborate eulogy, but I desire, on behalf of the court, to express, in few words, the enduring respect and affection which we entertain for our deceased friend, and our deep sense of the great loss which the profession and the community have sustained in his death.

Judge Soule was born in 1827. His father, the Rev. Gideon Soule, was for many years the Principal of Phillips Academy at Exeter, then, as now, one of the most celebrated preparatory

schools for boys in the country. The Judge inherited from him a sound mind in a sound body. He was of a robust and vigorous frame, healthy and strong, capable of enduring constant and exacting labor. He also inherited an intellect vigorous and logical, and also scholarly and delicate, and a high-toned, noble moral character. His natural tendency and the habit of his life was to look to high and ennobling aims. He was a graduate of Harvard College and of the Law School connected with it; and, very soon after leaving the Law School, he established himself in Springfield as a member of your bar. His history here is familiar to all of you. After a few years, he associated himself with the lamented John Wells, and soon became one of the most prominent of your members. Who can wonder that two such men were drawn to each other? Both were of the same nobility of character, both loved the law as a science and were diligent and assiduous in its study, both had habits of exact and thorough investigation, both were faithful to duty, modest, unselfish, just, and conscientious. By an unusual coincidence both afterwards served with marked ability as Justices of this court.

The service of Mr. Justice Soule was unfortunately of brief duration. He was appointed in 1877, and resigned in 1881. He discharged his important duties with great ability and with punctilious fidelity. His mind was quick to perceive the point involved in any case before him, and comprehensive to see its bearings and relations, and its effect upon the rights of parties. At nisi prius trials, he was patient, courteous, self-possessed, and firm. In consultation, he was logical and forcible in discussion, concise and clear, and never obscure, in presenting his arguments, with the frank manliness which never hesitated to differ from his associates, accompanied by a spirit of candor which led him readily to yield his own impressions when he found that the weight of argument and reason was against him. When at the end of four years he resigned, he had so commended himself to the profession and the public, by the satisfactory performance of his duties, that his retirement was universally felt to be a great public loss. He resigned with great reluctance, after a severe struggle between his own inclination and tastes and the promptings of duty to his family. It is a pleasure to us to reflect that his duties while with us were pleasant and congenial to

him, and that his term of service here was the happiest period of his life. After he left us, his time was absorbed by the duties of his new position. He was often called upon, in the performance of those duties, to argue questions of law before us ; and his arguments were always models of clear, concise, and forcible statements and illustrations of his views.

We cannot fully express our estimate of the worth of Mr. Justice Soule without referring to the many attractive traits of his personal and private character and life. To the stranger, upon first acquaintance, he may have appeared dignified and somewhat distant and cold in his manner. But a short acquaintance was sufficient to lead to admiration of his kind and sympathetic heart, his urbane and courteous manners, his ready and delightful flow of wit and repartee. In his family and private life he was ever affectionate, kind, cheerful, hospitable, and unselfish, — a fond husband and father, a firm friend, and a delightful companion.

For the last two or three years of his life he knew that disease had fastened itself upon him, and that in a short time it must result fatally, a fact known to very few except to his family and his physicians. All who saw him during these years know that he bore this affliction with brave resignation and Christian fortitude, maintaining to the last the cheerfulness and unselfishness which had marked his whole life. We, who knew him well, mourn the loss, not only of an upright, able magistrate and lawyer, but of an esteemed and beloved friend.

I have spoken of two of the members of this bar who have honored it by faithful and able services upon this bench. To these should be added the honored name of Chief Justice Chapman. Truly the bar of Hampden County may indulge a just pride in the memory of such eminent lawyers and jurists as Judges Chapman, Wells, and Soule.

We can only add, that we concur in the expressions of esteem and affection contained in your resolutions, and shall order that they, together with a memorandum of these proceedings, be entered upon the records of the court.

The Court then adjourned.