ATTORNEY GENERAL *vs.* JOHN W. TREHY.

Suffolk.    January 15, 1901. — March 1, 1901.

Present: HOLMES, C. J., KNOWLTON, MORTON, BARKER, & LORING, JJ.

The almoner of Chicopee is not a judicial officer.

The civil service commissioners have power to require offices involving confidential relations between the incumbent and his superior, which are not by statute exempted from their rules, to be filled under the rules, or so may classify them that they will be free.

The almoner of Chicopee, appointed annually by the overseers of the poor of that city, is not a head of a principal department, and his appointment is subject to the rules made by the civil service commissioners.

*Semble,* that the overseers of the poor of the city of Chicopee are heads of a principal department and as such exempted from classification under the civil service laws.

INFORMATION in the nature of a *quo warranto* by the Attorney General at the relation of the civil service commissioners

against one John W. Trehy, whom the overseers of the poor of the city of Chicopee appointed almoner without making requisition upon the relators for the names of eligible persons as required by their rules, filed as amended November 23, 1900.

The answer among other matters alleged that the duties of the respondent as city almoner are prescribed and set forth in the Revised Ordinances of 1898 of the city of Chicopee, a copy of which, so far as they relate to such duties, was annexed to the answer; that the duties are more than clerical and are not simply routine, and the proper discharge of the duties involves the exercise of judgment, discretion and responsibility; that the almoner is required to act for and in place of the board of overseers of the poor, with the same authority as that board, and to perform acts and make agreements and decisions which are binding upon and control the city of Chicopee and impose financial obligations upon the said city, and which are of such a nature that the city will be bound thereby and answerable therefor; that the duties of the office are chiefly judicial, and not clerical, and that in the exercise of the duties of his office the almoner is in effect the head of the pauper department, that being one of the principal departments of the city of Chicopee; and he is not affected in his office by any rules made by the civil service commissioners for the selection of persons to fill offices in the government of the Commonwealth, and of the several cities thereof, which are required to be filled by appointment.

The case was heard upon the amended information and answer by *Morton*, J., who at the request of the parties reported it for the consideration of the full court, such order to be made as law and justice might require.

*F. H. Nash*, Assistant Attorney General, for the relators.

*L. E. Hitchcock*, for the respondent.

BARKER, J.    This information, in the nature of *quo warranto*, is brought under St. 1899, c. 376, at the relation of the civil service commissioners, to try the respondent's title to the office of city almoner of Chicopee, an office created by the charter of the city.    A vacancy existing in the office, the respondent was appointed to fill it from May 1, 1900, by the board of overseers of

the poor of the city, without making a requisition upon the civil service commissioners for the names of eligible persons.

Our statute requires the commissioners to prepare rules " for the selection of persons to fill offices in the government of the Commonwealth and of the several cities thereof, which are to be filled by appointment, and for the selection of persons to be employed as laborers or otherwise in the service of the Commonwealth and of the several cities thereof." St. 1884, c. 320, § 2. Such rules may be made from time to time and may be given a general or a limited application. They must, among other things, provide " For the classification of the offices and employments to be filled," " For open competitive and other examinations by which to test applicants for office, or for employment, as to their practical fitness to discharge the duties of the positions which they desire to fill," and " For the filling of vacancies in offices in accordance with the results of such examinations." St. 1884, c. 320, § 14, cls. 1, 2, 3.

But " Elective or judicial officers and officers whose appointment is subject to confirmation by the executive council, a city council or a school committee, heads of any principal department in a city, officers for the faithful discharge of whose duties a superior officer is required to give bond, teachers of the public schools, the private secretary of the governor or of the mayor of any city shall not be affected, as to their election or selection, by any rules made as aforesaid ; but such rules shall apply to members of the police and fire departments other than police and fire commissioners, chief superintendents and marshals of police departments, and chief engineers of fire departments." St. 1884, c. 320, § 15. This section has been twice amended but the amendments do not seem to be material to the present discussion. See St. 1893, c. 95 ; St. 1896, c. 502.

The classification of offices and employments to be filled, and the rules made by the commissioners with the approval of the governor and council, have the force of laws and are binding upon appointing officers. *Opinion of the Justices,* 145 Mass. 587, 590.

The commissioners by their rules have classified the office of almoner as one to be filled under the provisions of the statute, and have required that whenever there is a vacancy to be filled

in the office the appointing officer or power shall make requisition upon the commissioners for the names of eligible persons. To become such eligible persons applicants must undergo an examination, the subjects of which have been designated by the commissioners, which must be such as the needs of the service require and as tend to prove the qualifications of the applicant for the office sought. The commissioners may also order examinations upon other subjects of a technical or special character, to test the capacity which may be needed in any part of the classified service which requires peculiar information or skill, and these examinations may be either competitive or noncompetitive.

The rule making the classification and requiring the requisition when there is a vacancy to be filled, is as follows :

"Schedule A shall include clerks, copyists, recorders, bookkeepers, inspectors, agents, almoners, visitors, stenographers, typewriters, messengers, and persons rendering service similar to that of any of the above specified positions in the service of the Commonwealth or of any city thereof, under whatever designation, whether such service is permanent or temporary, and whether the same is paid by time for work done, by the piece, or in any other manner.

" Whenever there is a vacancy to be filled in the classified service, the appointing officer or power shall make requisition upon the commissioners for the names of eligible persons.

" The subjects of examination may be designated from time to time by the commissioners, and shall be such as the needs of the service require, and such as tend to prove the qualifications of the applicant for the office sought.

" The commissioners may also order examinations upon other subjects of a technical or special character, to test the capacity which may be needed in any part of the classified service which requires peculiar information or skill. Examinations hereunder may be competitive or non-competitive. The application for, and notice of, the special examinations, the records thereof, and the certification of those found competent, shall be such as the commissioners may prescribe."

The charter of Chicopee does not name any board or union of boards its city council. It vests the government of the city

and the administration of all its affairs, except those of the public schools, in an executive department consisting of one officer, the mayor, and in a legislative department consisting of a single body, the board of aldermen. St. 1897, c. 239, § 2. It further provides for certain administrative officers to be appointed by the mayor, and who shall perform the duties prescribed for them by the general laws, and by the charter, and such further duties not inconsistent with the nature of their respective offices as the board of aldermen may from time to time prescribe. Among these administrative officers are " a board of overseers of the poor, to consist of three persons." St. 1897, c. 239, § 38.

Another section provides for the office now in question. " The overseers of the poor shall annually appoint a city physician and an almoner, neither of whom shall be one of their own number, who shall, under the direction of said overseers, severally perform such duties as may be required by ordinance, and such further duties as said overseers may from time to time require. They may be removed from office at any time by the overseers for such cause as said overseers may deem sufficient. Members of the board of overseers of the poor shall serve without compensation." St. 1897, c. 239, § 44.

Further provision of the charter are in substance that the administrative officers and boards shall annually furnish to the mayor "an itemized and detailed estimate of the moneys required for their respective departments or offices during the ensuing financial year." St. 1897, c. 239, § 54. That " Every administrative board, through its chairman, and every officer having charge of a department, shall, at the request of the board of aldermen, appear before it and give such information as it may require in relation to any matter, act or thing connected with the discharge of the duties of such board or officer ; and when so requested to appear the officer who appears shall have the right to speak upon all matters under consideration relating to his department." St. 1897, c. 239, § 56. There is also a section providing that nothing in the charter shall affect the enforcement of the civil service laws or of the rules made by the commissioners thereunder, and that the board of aldermen shall make sufficient and proper appropriations for carrying out

and enforcing those laws and rules in the city.   St. 1897, c. 239, § 57.

As the rule classifying the office of almoner as one to be filled by requisition upon the civil service commissioners for names of eligible persons had long been in force when the charter of Chicopee was revised by the Act of 1897, the provision of the section last quoted comes near to being a declaration that in the opinion of the Legislature which granted the present charter the office now in question was one which the civil service acts and rules might require to be filled under those rules.

The office of almoner is not one created by any statute of general application, nor are its duties defined by any such statute. . The first use of the term as designating a municipal office, which we have found is in the city charter of Northampton, which provides for the election of six persons to be the board of almoners of the city under the provisions of the Whiting Street will, the mayor of the city to be *ex officio* chairman of the board, and its members to serve without compensation.   St. 1883, c. 250, § 26.   See also St. 1900, c. 427, § 30.   In the charter of the city of Marlborough is a provision that the board of overseers of the poor may annually elect an almoner, not one of their own number, who shall serve as clerk of the board, with compensation to be fixed by vote of the city council, and removable by the board.   St. 1890, c. 320, § 25.   The original charter of Chicopee has a similar provision, and also a provision for the election of three persons to constitute the board of almoners of the city, under the provisions of the Whiting Street will, the members to serve without compensation.   St. 1890, c. 189, §§ 26, 29.   In the North Adams charter it is provided that the auditor shall also be the city almoner, and he is required to keep a record of settlements of paupers and under the direction of the overseers of the poor to relieve paupers outside of the almshouse, see that paupers chargeable elsewhere are maintained by their own municipalities, that the city is reimbursed for outlays made for paupers having no settlement in the city.   He is also to report cases needing legal attention to the city solicitor, furnish him with information, and perform such other duties as the overseers of the poor may direct.   St. 1895, c. 148, § 42.

In some city charters provision is made for the appointment of an agent, clerk, or superintendent by the board of overseers of the poor, and in such case the duties of the officer so appointed would no doubt be similar to those incumbent on the respondent. See St. 1884, c. 309, § 22; St. 1890, c. 275; St. 1894, c. 190, amending St. 1875, c. 173, § 29; St. 1895, c. 302, § 24. In other charters more general power is given to employ, discharge and remove all subordinate officers, clerks and assistants. St. 1892, c. 324, § 37; St. 1892, c. 355, § 38. See also St. 1892, c. 377, § 2, art. 38.

In still other charters general power is given to the city council to choose and appoint all subordinate officers for whose election or appointment other provision is not made and to define their duties and fix their compensation. St. 1881, c. 169, § 23. St. 1873, c. 246, § 16. St. 1873, c. 154, § 33. In those charters in which this authority is not specifically given it is no doubt covered by the general grant establishing the city and vesting its government and the administration of its affairs in its legislative and executive departments.

What cities other than Chicopee have almoners whose offices are established by their charters or by ordinance is not material. The respondent has been appointed to and is exercising that office in the city of Chicopee. By the charter the office is one in the government of the city required to be filled by appointment. This authorizes the civil service commissioners to make rules for the selection of persons to fill it, under St. 1884, c. 320, § 2, and to classify it as one to be filled upon requisition to them of the names of persons eligible, unless the office is one, as the respondent contends, the incumbent of which is not affected by the classification and rules of the commissioners.

The respondent is not an elective officer nor is his appointment subject to confirmation. He contends that his duties are of such a nature as to bring him within the class of judicial officers. This contention is unsound. In passing upon questions of settlement and in dealing with paupers and persons claiming relief from the city under the poor laws or bounty or alms under the provisions of the Whiting Street will, as well as in discharging all other duties imposed upon him by the charter and ordinances, he is simply an administrative officer. If

his acts concerning a pauper founded upon his view of the law fix or impose an obligation upon the city, it is not by way of judicial determination, but of administrative action.

He also contends that he is not affected by the commissioners' classification because a confidential relation exists between himself and the board of overseers of the poor. Assuming that such a relation exists it is not one of the things which precludes the office from being classified as one to be filled under the rules. Certain confidential offices are named in the section which defines the offices not to be affected by the classification and rules of the commissioners, and many other such offices are comprehended in the general classes exempted by the section. Aside from these exemptions the statute leaves to the commissioners power in their judgment and discretion to require offices involving confidential relations between the incumbent and his superior to be filled under the rules, or to so classify them that they will be free.

The remaining contention is that the respondent's office cannot be included properly in the classification in which it has been put by the commissioners, because the incumbent is one of the heads of a principal department in the city. All " heads of any principal department in a city " the statute declares " shall not be affected, as to their election or selection, by any rules " made by the commissioners.

Practically separate departments have always existed in city governments, but there are few if any instances before the enactment of the civil service statute of 1884, of the use of the word " department " in city charters, except in the phrase " Fire department," which was not unusual. The meaning of the phrase " principal department in a city " in that statute must, we think, be determined without much help from subsequent charters, in which the word " department " and the phrase " head of a department " have been used quite commonly. See St. 1888, c. 347; St. 1889, c. 411, § 31; St. 1890, c. 189, § 33; c. 320, § 34; St. 1892, c. 324, §§ 30, 31, 38, 39, 44; c. 355, §§ 31, 32, 38, 39, 42; St. 1892, c. 377; St. 1895, c. 148; St. 1899, c. 162, §§ 2, 9, 27, 32, 36, 41, 42, 47; St. 1900, c. 427, §§ 57, 64, 65, 75. The statute under which the respondent's office was created makes quite frequent use of the word " department." St. 1897,

c. 239. We do not however find the exact phrase "heads of any principal department in a city" except in the section of the civil service statute now under consideration.

Looking at the second section of the revised charter of Chicopee it might be said that the only "principal departments" of the government of that city were the executive, consisting of one officer, the mayor, and the legislative, consisting of a single body, the board of aldermen. These are each called departments in the charter, and in a sense they are clearly the principal departments. But the phrase "heads of any principal department in a city," in the civil service statute, plainly was not meant to designate merely the mayor and aldermen. Without attempting to state all that the phrase does and does not include in the way of municipal officers, we are of opinion that those city officials who are charged with the administration of the poor laws constitute a principal department of the city government within the meaning of St. 1884, c. 320, § 15.

The remaining question is whether the respondent is one of the heads of that department. We think not. The chief head of that department is the mayor. St. 1897, c. 239, §§ 2, 28. City Ordinances of Chicopee, c. 12, § 3. The other heads of the department are the three overseers of the poor, one of whom is its chairman. St. 1897, c. 239, §§ 15, 38, 44. These three officials are appointed by the mayor. The city has, *eo nomine*, no city council, nor does the charter require that the appointments of overseers of the poor shall be confirmed by the single board of aldermen. Therefore in this instance, which so far as we have observed is unique, the overseers themselves are exempted by the statute only as "heads of any principal department," which we think they are. They have large powers devolved upon them by the general laws, as well as by the charter. They are given the power to appoint and remove not only the almoner and the city physician but also officers, clerks and employees in their department. St. 1897, c. 239, §§ 44, 48. As to the respondent he is appointed by the overseers, and is removable by them for such cause as they may deem sufficient. All his duties are those of a subordinate, to be performed under the direction of the mayor and of the overseers. He has no power to appoint or discharge any employee who may be in the

department under his own rank.   Indeed so far as appears there are no such subordinates.   He is not in any sense a head either of the pauper department, or of the department in charge of the administration of the funds to be distributed by the almoners of the Whiting Street will.   See *People* v. *Kipley*, 171 Ill. 44.

*Judgment of ouster.*