COMMONWEALTH *vs.* BOSTON TERMINAL COMPANY.

Suffolk.   November 12, 1903. — March 3, 1904.

Present: KNOWLTON, C. J., MORTON, LATHROP, BARKER, & BRALEY, JJ.

*Commonwealth.   Boston Terminal Company.*

The Commonwealth, where it has not parted with its title, owns the soil under navigable waters within a marine league from extreme low water mark.

By St. 1896, c. 516, providing for a south union station in Boston, the Legislature neither expressly nor by implication granted to the Boston Terminal Company any part of the land of the Commonwealth under navigable waters, but gave that company the right to take in fee by right of eminent domain such portions

of the land of the Commonwealth as were needed for the station and its approaches. Therefore the Commonwealth was entitled to recover from the terminal company under the terms of the act compensation for the land so taken. The fact that § 14 of the act required the terminal company without compensation to convey to the city of Boston for the location of Dorchester Avenue and Summer Street nearly one half of the land so taken, does not affect this conclusion, as this was an express condition imposed by the Legislature to which the company agreed by accepting the act.

PETITION, filed January 4, 1898, for the assessment of damages for lands of the Commonwealth lying below extreme low water mark, taken in fee by the respondent under St. 1896, c. 516.

In the Superior Court the case was heard by *Hardy,* J. upon the petition, a demurrer and agreed facts. The judge overruled the demurrer, and, at the request of the parties, being of opinion that the questions involved ought to be determined by this court before any further proceedings in the Superior Court, reported the case for such determination.

*F. H. Nash,* Assistant Attorney General, (*R. G. Dodge,* Assistant Attorney General, with him,) for the Commonwealth.

*S. Hoar & W. Hudson,* for the respondent.

BRALEY, J. It must now be taken as settled that the territorial limits of the Commonwealth extend one marine league from its seashore at the line of extreme low water, and the title to the land within these boundaries, except as it may have been granted to others or acquired by them previously to St. 1867, c. 275, by prescription is vested in the State. St. 1859, c. 289. Gen. Sts. c. 1, § 1. Pub. Sts. c. 1, § 1. *Dunham* v. *Lamphere,* 3 Gray, 268, 270. *Wonson* v. *Wonson,* 14 Allen, 71, 82. *Nichols* v. *Boston,* 98 Mass. 39. *Commonwealth* v. *Manchester,* 152 Mass. 230, 240. *Attorney General* v. *Revere Copper Co.* 152 Mass. 444, 450. *Manchester* v. *Massachusetts,* 139 U. S. 240.

In its sovereignty it represents not only the proprietary right formerly held by the king, and which at the Revolution was in the Colony, and then passed by succession to the State, but it also became vested by the same event, with jurisdiction and dominion over the common right of the people at large to the free use of such tidal waters for fishing and navigation. *Barker* v. *Bates,* 13 Pick. 255, 259. *Dill* v. *Wareham,* 7 Met. 438.

*Drake* v. *Curtis*, 1 Cush. 395, 413.     *Commonwealth* v. *Alger*,
7 Cush. 53, 58.     *Commonwealth* v. *Hilton*, 174 Mass. 29, 30.
*McCready* v. *Virginia*, 94 U. S. 391.

Whatever may have been the rights of the crown under the
early common law, the king could not in recent times sell his
proprietary interest in lands covered by such waters so as to de-
prive his subjects of these rights.     *Weston* v. *Sampson*, 8 Cush.
347, 349, 351.     *Attorney General* v. *Parmeter*, 10 Price, 378.
*Parmeter* v. *Attorney General*, 10 Price, 412.     *Gann* v. *Whit-
stable Free Fishers*, 11 H. L. Cas. 192, 217.

In this country the decisions of the courts of the several
States as to the right of the State to devest itself of its trustee-
ship have not been uniform.     The cases are collected and ex-
haustively reviewed and the principle discussed by Gray, J. in
*Shively* v. *Bowlby*, 152 U. S. 1, 26.

But the common law of this State, whatever the rule may
have been in other jurisdictions, has not recognized this limita-
tion as binding on the Legislature, to whom is given the control
of all public rights.

Originally, and before the ordinance of 1647, the title of
the Colony included flats between high and low water mark.
By that ordinance these flats not previously granted to individ-
uals or appropriated to public uses became the property of the
owner of the adjoining upland " where the sea doth not ebb
above a hundred rods, and not more wheresoever it ebbs fur-
ther."     *Wonson* v. *Wonson, ubi supra.*     The ordinance left
unaffected the remainder of the public domain below the line
established, and within the limit subsequently defined as a
marine league therefrom.

The title or proprietary right is to the soil itself, not to the
water that may cover it, either for a part or all of the time.
That is, the sovereign power, having the absolute right to ter-
minate the trust which is appurtenant to its ownership, can
refuse to act longer as trustee, and convey its property, so that
the grantee will hold it free from the trust, *Boston* v. *Richardson*,
105 Mass. 351, 356, 362, 363, *Henry* v. *Newburyport*, 149 Mass.
582, 585, *Martin* v. *Waddell*, 16 Pet. 367, 410, *McCready* v.
*Virginia, ubi supra,* and being vested with both rights can by
way of grant pass its interest by an act of the Legislature in

lands that are below extreme low water mark, and which when filled by the grantee will extinguish the right of user by the public. *Boston & Hingham Steamboat Co.* v. *Munson,* 117 Mass. 34. *Attorney General* v. *Gardiner,* 117 Mass. 492, 499. *Drury* v. *Midland Railroad,* 127 Mass. 571, 583, and note. *Hastings* v. *Grimshaw,* 153 Mass. 497. See Resolves 1856, c. 76 ; St. 1860, c. 200.

Though for the purposes of protection of the seashore, and securing to all of its citizens the right and benefit of unobstructed navigation of tidal waters, notwithstanding such grant, it may require the grantee to obtain its license or permission to wharf or to fill before such waters can be displaced by any structure or filling. St. 1866, c. 149. Pub. Sts. c. 19, § 8. *Attorney General* v. *Boston & Lowell Railroad,* 118 Mass. 345, 348. *Attorney General* v. *Cambridge,* 119 Mass. 518. See also in this connection *Lake Shore & Michigan Southern Railway* v. *Ohio,* 165 U. S. 365 ; *Cummings* v. *Chicago,* 188 U. S. 410 ; *Montgomery* v. *Portland,* 190 U. S. 89.

The Commonwealth, then, must be held to have had a right of property in and title to the several parcels of land described in the petition, and all situated below the line of extreme low water. By the demurrer the respondent admits that it has taken this land by force of and in accordance with the provisions of St. 1896, c. 516.

The Boston Terminal Company was organized under this act to build and maintain a union passenger station in the southerly part of the city of Boston, and to provide and operate adequate terminal facilities for the various railroad companies named therein which, upon completion of the station, are required to occupy and use it.

Its capital stock amounting to $500,000 in the proportion of one fifth to each, could be subscribed for and held by these various corporations, and "all said capital stock shall be paid in in cash by said railroad companies before the corporation takes any land under the provisions of this act," so that in this way the money estimated to be necessary to pay for the land to be taken for the site of the proposed station and its approaches would be paid in before the work was begun. The immediate government, direction and control of its affairs were vested in

a board of five trustees, one of whom was to be appointed by each of the five railroad companies.

Instead of the railroad companies themselves uniting to build the station, the history of the statute indicates that it was apparently deemed best that the several persons named as incorporators should organize a corporation for this purpose.

It was a plan undertaken in this form by those connected with or interested in the railroads to be benefited, and it is too plain for discussion that, standing by itself, it would be financially unprofitable and must fail of success, and though possessing a distinct and independent corporate existence the respondent must be treated as a company created and organized as an auxiliary to the railroads. *Frazier* v. *New York, New Haven, & Hartford Railroad*, 180 Mass. 427.

There is nothing in the act by which it was compelled to begin, go forward and complete this work, but it may fairly be inferred and conceded that if once commenced, then the plan was to be carried out according to the specified details, and to this extent it may be said to be mandatory. *Bradford* v. *Old Colony Railroad*, 181 Mass. 33, 35.

But not rigidly so, for the language used as to the taking of land to change the streets is permissive. A certain amount of flexibility at least was left, so that if the whole territory named was not necessary, or if the combination of the parts, to make up the whole, could be better adjusted by changes, such changes were permissible. If it be granted that the taking of the land for Dorchester Avenue and Summer Street and for the station itself must have necessarily included the lands described in the petition, yet it was open to the respondent, if it did not want to pay for what it must take, either to abandon its project or petition for a change in the act.

Under these conditions it was within the power of the Legislature to determine in the first instance if the enterprise for whose benefit private property was to be appropriated was of such a character that the purpose of the respondent constituted a public use of the land, and the State might permit a part of its domain to be taken for such a use in fee, or a less interest therein without compensation, but such a grant must be made by a legislative act. *Talbot* v. *Hudson*, 16 Gray, 417. This

brings us to the main contention of the respondent, that here such a grant should be inferred, because the land after it was taken still remained subject to a public easement, nearly one half in area being used for public ways known as Dorchester Avenue and Summer Street, and the remainder for the station itself. *Prince* v. *Crocker*, 166 Mass. 347, 361. And though the nature of the user by the public had changed from that of rights in navigable waters to those of reasonable facilities of access to and transportation as passengers on railroads that were common carriers, and into legally created highways for public travel, yet the easement in each instance was for the benefit of the public, and it must therefore have been intended that the latter easement should be taken and deemed to be a fair equivalent or set-off for the other, and it ought not to be held to pay for the land so taken.

In taking the land authorized by the statute a title in fee was to be acquired, either by purchase from the owners or by the exercise of the right of eminent domain. This right could not under the Constitution have been legally given to the respondent, if it were not for the principle that land held by railroads, whether within the location necessary for the placing of tracks or to afford access to them, is considered subjected to a public use. *Talbot* v. *Hudson* and *Prince* v. *Crocker*, *ubi supra*.

But if a fee is taken, the title is not wholly within the control of the State, for when the public use ceases, then land so held is the private property of the taker, discharged from the easement. *Mount Hope Cemetery* v. *Boston*, 158 Mass. 509, 512, and authorities cited.

There is no doubt that the title of the respondent in this case must be measured by the extent of the taking, which was in fee, and not of a mere easement; and the strength of the argument is weakened by this fact, that instead of relying on the construction now put forward, that a fee was granted by implication, and if so, then the title passed absolutely by force of the act and nothing further was necessary, it preferred to acquire and hold the land through the delegated right of eminent domain.

" And if there is such a thing as a new title known to the

law, one founded upon a taking by the right of eminent domain is as clear an example as can be found." Holmes, C. J. in *Emery* v. *Boston Terminal Co.* 178 Mass. 172, 184.

If it be said that under § 14 the respondent was required to convey subsequently without compensation to the city of Boston so much of the real estate described in the petition that is now within the lay out and location of Dorchester Avenue and Summer Street, and that it could not be compelled to part title to its property without compensation even if the use was in part for the benefit of the public, the principal question involved is not affected, for the reason that the respondent was not obliged to accept the act, but if it did, then it must be held to have assented to this condition. *Hampshire* v. *Franklin*, 16 Mass. 76, 87.

While it is true that the people who use the facilities for travel from place to place furnished by the railroad companies occupying the terminal station, which in a broad sense can be held to include not only the building, but all the appurtenances that make it accessible and usable, are benefited, yet the railroads share in the benefit, and the nature of the undertaking itself from whatever point of view remains unchanged.

The respondent must accept the burdens while receiving the benefits. And the statute is to be construed as a legislative act by which the respondent was enabled to complete its scheme of a terminal station for pecuniary profit, though it was required to contribute a part of its property to another public use, made necessary solely to enable it to carry out its purpose.

It cannot be held that the State, any more than an individual, parts with title in fee to real estate by implication alone; and if its land is to be granted in aid of a private corporation, even if the public may thereby be more largely accommodated, this intention must clearly appear by the express words of the act under which the grant is claimed. *Commonwealth* v. *Roxbury*, 9 Gray, 451. *Commissioners on Inland Fisheries* v. *Holyoke Water Power Co.* 104 Mass. 446, 467. *Attorney General* v. *Jamaica Pond Aqueduct*, 133 Mass. 361, 365. *Charles River Bridge* v. *Warren Bridge*, 11 Pet. 420.

There is no doubt that where the precise wording of a statute is such that, if exactly carried out, the result would not

be what the Legislature intended, the literal language used may be rejected; but here the real design or object to be effected is precisely and clearly expressed, and the words used must therefore be given their ordinary meaning and construction, and which will carry that design into effect.

Though in taking the lands prescribed by the terms of the act it would be obliged to acquire those of the Commonwealth included in such description, no intention appears to give this property to the respondent, or to grant the right to acquire title upon conditions other than those by which it was authorized to purchase or take land belonging to others. The authority to take, and the requirement of compensation to be paid for what is taken, go together, and are expressed in the same language as to both classes of owners. *Commonwealth* v. *Boston & Maine Railroad,* 3 Cush. 25. *Old Colony & Fall River Railroad* v. *Plymouth County,* 14 Gray, 155, 161 *ad finem. Grand Junction Railroad & Depot Co.* v. *County Commissioners,* 14 Gray, 553, 565. *Boston & Albany Railroad* v. *Cambridge,* 159 Mass. 283, 285, and cases cited.

The ruling of the Superior Court was right, and the order overruling the demurrer is affirmed.

*So ordered.*