BOSTON WATERFRONT DEVELOPMENT CORPORATION vs.
COMMONWEALTH.

Suffolk.   April 13, 1977. — April 12, 1978.

Present: HALE, C.J., GOODMAN, & GRANT, JJ.

Harbors. Real Property, Harbors, Wharf, Grant, Restriction, Littoral
    property.

Statute 1832, c. 102, § 1; St. 1834, c. 115; and St. 1840, c. 18, authorizing
    the Lewis Wharf Company "to extend and maintain their wharves,
    in the city of Boston, into the harbor channel," was a grant of fee
    simple title to certain waterfront property rather than a mere li-
    cense. [219–225]
The grant of title to certain waterfront property effected by St. 1832,
    c. 102, § 1; St. 1834, c. 115; and St. 1840, c. 18, was upon a condition
    subsequent that the property be used for the purposes expressed in
    the statutes. [225–228]

PETITION filed in the Land Court on March 19, 1964.

The case was heard by *Randall, J.*

*Howard R. Palmer*, Assistant Attorney General, for the
Commonwealth

*Peter W. Bradbury* (*Arnold P. Messing* with him) for the
petitioner.

GOODMAN, J. This petition was originally brought to
register and confirm title to certain waterfront property
in the city of Boston, shown on the accompanying dia-
gram (see 229, *infra*) as areas A, B, and C, and parcel F.
The Commonwealth filed an answer, in effect claiming
title to that portion of the property below the Baldwin low
water mark of 1846[1] (areas B and C and parcel F). The

---

[1] During the litigation in *Wheeler* v. *Stone*, 1 Cush. 313 (1848), the
Supreme Judicial Court appointed one George R. Baldwin to deter-
mine the ancient lines of high and low water in a portion of Boston
Harbor. 1 Cush. at 320 and 323. In 1868 the then Attorney General,

case was argued on the pleadings, after which the petitioner and the Commonwealth stipulated that the sole question for decision was whether the Commonwealth by certain legislative grants had given the petitioner fee simple title to the soil (beneath the fill) under the wharf which covers area B.[2] The judge filed a decision in which he ruled that the petitioner had fee simple title to area B; the Commonwealth appeals from the judge's decision. See G. L. c. 185, § 15, as appearing in St. 1973, c. 1114, § 25. The appeal comes to us on the parties' agreed statement of the case. See Mass.R.A.P. 8(d), 365 Mass. 851 (1974).

In 1832 Lewis Wharf lay entirely to the west of the Baldwin low water mark of 1846. By St. 1832, c. 102, § 1, the then owners of Lewis Wharf (through whom the petitioner claims title to area B) were "authorized and empowered to extend and maintain the said wharf into the harbor channel" to a line east of and including area B. Section 1 further provided "that the proprietors of said Lewis' Wharf, shall have and enjoy the right and privilege of laying vessels at the sides and end of their said wharf and receiving dockage and wharfage therefor. *Provided*, that so much of said wharf, as may be constructed in said channel shall be built on piles . . . ." Section 2 of St. 1832, c. 102, provided that "nothing herein contained

---

Charles Allen (previously the Reporter of Decisions and later a Justice of the Supreme Judicial Court) observed the impracticability of determining the original high and low water marks in Boston Harbor and stated that the plan submitted by Baldwin in 1846 "was accepted by the eminent and learned counsel who represented the respective parties in that case . . . and was acted upon by the court, Chief Justice Shaw presiding, as giving the result of the best information then to be obtained upon the subject. There is no reason, that I am aware of, to believe that any new investigation would lead to any substantial change of the lines then drawn." 1868 Senate Doc. No. 302, at 2.

[2] Pursuant to the stipulation the petitioner withdrew without prejudice its registration petition for any portion of area C. It was agreed that parcel F was subject to certain rights of the Commonwealth and is not in dispute. The petitioner's ownership of area A is not contested.

shall be construed to authorize the said proprietors of Lewis Wharf to lessen or injure the rights or property of the owner or owners of any wharf or wharves adjoining said Lewis' Wharf."

Two years later the Lewis Wharf Company was incorporated by St. 1834, c. 115. By section 1 of that statute the company was given "power to hold, in fee simple or otherwise all or any part of that real estate situated in said city of Boston, including Lewis' wharf" and bounded ". . . by a line or lines in said channel as far . . . as said Lewis' wharf . . . may be lawfully extended." Section 1 further provides that the company "may, within the limits aforesaid, construct docks and wharves, lay vessels within and at the ends and sides thereof, and receive dockage and wharfage therefor, erect buildings, lay out streets and passage ways, and improve and manage said property, as to them shall seem expedient: *provided*, that nothing herein contained shall be understood as authorizing said corporation in any way to interfere with the legal rights of any person or persons whomsoever."

In 1837, in order "to preserve the Harbor of Boston and to prevent encroachments therein," the Legislature by St. 1837, c. 229, established a line in Boston Harbor "beyond which no wharf or pier shall ever hereafter be extended into and over the tide water of the Commonwealth."[3] This line lay some distance to the east of area B. By St. 1840, c. 18, the Lewis Wharf Company was "empowered and authorized to extend and maintain their wharves, in the city of Boston, into the harbor channel, as far as the line established by" St. 1837, c. 229. Statute 1840, c. 18, further stated that the company "shall have and enjoy the same rights and privileges of laying vessels at the sides and ends of their said wharves,

---

[3] See 1837 Senate Doc. No. 47 for the report of the commission created by legislative resolve to recommend whether and where to draw a line beyond which no wharf should be extended in Boston Harbor.

and of receiving wharfage and dockage therefor, which they now have: *provided*, that so much of said wharf as may be constructed into said channel, shall be built upon piles, and that nothing herein contained shall in any way interfere with the legal rights of the owners of any wharves adjoining that of said company, or of any other person whatever." Some time before 1850 the petitioner's predecessors in title extended Lewis Wharf to cover area B. Also, the area under the wharf was filled by predecessors of the petitioner, and it was stipulated that they had a right to do so. To understand the significance of these 1832, 1834, and 1840 statutes (hereinafter sometimes referred to as the Lewis Wharf statutes), we look to the background and development of the relevant law affecting the seashore.

By the colonial ordinance of 1641–1647 (see The Book of the General Lawes and Libertyes, at 50 [1649])[4] , all private owners of land bounded by the seashore, who formerly had held title only as far as the mean high water line, were granted fee simple title (subject to certain reserved public rights) to the adjoining flats as far as the mean low water line or a line 100 rods from the mean high water line, whichever was the lesser measure; the purpose of this ordinance was to encourage owners of coastal property to build wharves. *Opinion of the Justices*, 365 Mass. 681, 685–686 (1974), and material cited. The Colony, and later the Commonwealth, continued to hold title to the soil and waters lying beyond the flats granted by the colonial ordinance and not otherwise granted to private owners. That title is held "in trust, for public uses, established by ancient custom or regulated by law, the principal of which [are] for fishing and navigation." *Commonwealth* v. *Alger*, 7 Cush. 53, 65 (1853). *Commonwealth* v. *Roxbury*, 9 Gray 451, 482–484 (1857). *Common-*

---

[4] The ordinance is reproduced in pertinent part in *Opinion of the Justices*, 365 Mass. 681, 685 (1974). See also Colonial Laws of Massachusetts (reprinted in 1887 by order of the Boston city council).

*wealth* v. *Boston Terminal Co.*, 185 Mass. 281, 282–283 (1904). *Home for Aged - Women* v. *Commonwealth*, 202 Mass. 422, 427 (1909). *Opinion of the Justices*, 365 Mass. at 684–685. Nevertheless, "having the absolute right to terminate the trust which is appurtenant to its ownership, [the Commonwealth] can refuse to act longer as trustee and . . . can by way of grant pass its interest by an act of the Legislature in lands that are below extreme low water mark, and which when filled by the grantee will extinguish the right of user by the public." *Commonwealth* v. *Boston Terminal Co.*, 185 Mass. at 283–284. See also *Bradford* v. *McQuesten*, 182 Mass. 80, 81–82 (1902), and cases cited.

Before 1869 the Legislature passed hundreds of acts authorizing the construction and maintenance of wharves on flats in Boston Harbor and elsewhere.[5] *Bradford* v. *McQuesten*, 182 Mass. at 82. *Commissioners of Pub. Works* v. *Cities Serv. Oil Co.*, 308 Mass. 349, 354 (1941). The Supreme Judicial Court has stated that "[t]he acts were passed to promote trade and commerce by enabling and encouraging the owners of flats to build wharves, warehouses, and other structures thereon for the use and convenience of those having occasion to resort to the ports and harbors where the flats were situated, and requiring the facilities afforded by such structures. They should be construed so as best to promote the object which the Legislature had in view, if that can be done without doing violence to settled rules of construction." *Bradford* v. *McQuesten*, 182 Mass. at 82. By the late

---

[5] With the exception discussed in fn. 7 our examination of the legislative histories of a number of these acts has uncovered little information bearing upon the issues of this case. For the report of a commission established by the Legislature in 1848 (see St. 1848, c. 79) to report on the rights of the Commonwealth with relation to the flats in Boston Harbor, see 1850 Senate Doc. No. 3. Other reports to the Legislature by commissions established to report on questions concerning Boston Harbor include 1840 Senate Doc. No. 8, 1847 Senate Doc. No. 25, and 1851 House Doc. No. 106.

1860's the Legislature apparently woke up to the fact that: "Legislative grants have been made from time to time to individuals or corporations. These grants are worth to-day, in the aggregate, millions of dollars, and yet not a dollar has gone to the treasury of the State." Report Relative to the Flats and Water Areas of the Commonwealth, 1870 House Doc. No. 240, at 7. See 1868 House Doc. No. 76, at 6. The concern of the Legislature is reflected in St. 1869, c. 432, § 1, which provided that thereafter authority to erect structures in tide water "shall be revocable at any time, at the discretion of the legislature. . . ." That statute—together with St. 1866, c. 149, "An Act to establish a board of harbor commissioners"—began a process of regulation which culminated in what is now G. L. c. 91. "[T]he legislative intent was declared that thereafter any such authority should be construed as a revocable license, and not a grant." *Commissioners of Pub. Works* v. *Cities Serv. Oil Co.*, 308 Mass. at 354. That case points out (at 353) that grants made prior to 1869 of authority to erect structures in tide water had been construed "to operate as grants and not merely as revocable licenses"; it cites *Fitchburg R.R.* v. *Boston & Me. R.R.*, 3 Cush. 58, 87 (1849), construing St. 1841, c. 35; *Bradford* v. *McQuesten*, 182 Mass. at 81, 82, construing St. 1851, c. 26; and *Treasurer & Recr. Gen.* v. *Revere Sugar Refinery*, 247 Mass. 483, 489 (1924), construing St. 1855, c. 481.

The Commonwealth concedes that since statutes similar to those under which the petitioner claims title have been construed to operate as grants and not merely as revocable licenses, it follows that whatever interest in or privilege to use area B the Legislature granted, that interest or privilege is irrevocable. The Commonwealth contends, however, that the previous decisions of the Supreme Judicial Court have left open the question as to the nature of the interest or privilege granted by the Legislature, and it urges that we hold that what was granted in area B was not an interest in the realty, but was simply an irrevocable license or privilege to use area B subject

to forfeiture if the plaintiff ceased to use the wharf built over area B in a manner consistent with the Legislature's purpose in granting that privilege.[6] The cases decided by the Supreme Judicial Court involving pre-1869 statutes conferring authority to erect and maintain wharves on flats below the low water mark in Boston Harbor and elsewhere do not support the Commonwealth's analysis. The Supreme Judicial Court has viewed such statutes as constituting grants of title to the soil over which, pursuant to such statutes, wharves have been extended and maintained, and not as grants of irrevocable licenses.

In *Attorney General* v. *Boston Wharf Co.*, 12 Gray 553 (1859), the Supreme Judicial Court was called upon to construe St. 1855, c. 455, together with certain earlier statutes; by St. 1855, c. 455, the defendants were "authorized to extend their wharf in South Boston from the line of private rights one hundred rods from high-water mark to the commissioners' line B, established by [St. 1853, c. 385], . . . and to maintain the same in the mode prescribed by law" subject to certain provisos. The Supreme Judicial Court stated in that case (at 562) that "[t]he effect of [St. 1855, c. 455] is so plain and obvious that it cannot be mistaken," that it confirmed the rights, already granted the defendants by the earlier statutes, to the flats between the high water mark and the line one hundred rods below the high water mark, and that it "granted and *conveyed* to [the defendants] all the flats, below and northerly of . . . [the line one hundred rods distant from the high water mark], . . . to the commissioners' line B, which were not in front of the land or flats of any other person" (emphasis supplied). 12 Gray at 562.

---

[6] The concept of an irrevocable license is found in contemporary legislation. See, e.g., St. 1969, cc. 907 and 908; St. 1970, c. 858. Professor Rice in his Study of the Law Pertaining to the Tidelands of Massachusetts, made for the special commission to study irrevocable licenses, points out that between 1959 and 1969 forty-five special acts were passed "that confirm and make irrevocable particular licenses of the Department of Public Works." 1971 House Doc. No. 4932, at 36.

After further discussion the court declared, "[I]t fully and clearly appears that the flats granted to [the defendants] by the statute of 1855 were not situate and did not lie in front of the land or flats of any other person, and consequently that their right and title to the territories is unqualified and perfect." *Id.* at 563.[7]

*Bradford* v. *McQuesten*, 182 Mass. 80 (which construes St. 1851, c. 26, a statute virtually identical with St. 1832, c. 102), contains the court's most detailed explanation of its holding that such statutes conferring authority to build wharves on flats in Boston Harbor operated as grants and not as mere revocable licenses. The court stated: "It is plain, it seems to us, that it operated as a legislative grant subject to the terms and conditions expressed in it. *Fitchburg R.R.* v. *Boston & Me. R.R.*, 3 Cush. 58, 87 [1849]. No particular words are necessary to constitute a legislative grant, and the Commonwealth could divest itself of any right or title in or to the flats belonging to McKay, as well by an act of the Legislature, as by a more formal instrument . . . . *Hastings* v. *Grimshaw*, 153 Mass. 497 [1891] . . . . Hundreds of similar acts had been passed before St. 1869, c. 432, was enacted declaring that any authority thereafter given to build on or enclose

---

[7] The statutes involved in this case (including St. 1845, c. 239, St. 1850, c. 246, St. 1852, c. 171, St. 1854, c. 218, and St. 1855, c. 455) are the only statutes involving the extension and maintenance of wharves (so far as we have been able to determine) whose legislative history is at all informative. See 1845 House Doc. No. 58; 1852 Senate Docs. No. 44 and 121, and 1855 House Docs. No. 196, 208, and 220. See also 1870 House Doc. No. 240, at 7. These documents all appear to assume that a statute authorizing the extension and maintenance of a wharf below the low water mark constitutes a grant of the title to the flats over which the wharf is extended. For example, in 1852 Senate Doc. No. 44 at 1, the Committee on Mercantile Affairs and Insurance reported that the Boston Wharf Company's petition for a confirmation of St. 1845, c. 239, "granting to said company certain flats in front of their land" should be allowed. The committee's chairman observed in support of the committee's position, "The grant as originally made, differs not in any respect from other *grants of flats* to riparian proprietors, by legislative acts. Similar grants have frequently been made . . ." (emphasis supplied).

ground in tide waters should be construed as a revocable license, and it has been the common understanding, we think, that they operated as grants, and wharves have been built and improvements made on that footing. The acts were passed to promote trade and commerce by enabling and encouraging the owners of flats to build wharves, warehouses, and other structures thereon for the use and convenience of those having occasion to resort to the ports and harbors where the flats were situated, and requiring the facilities afforded by such structures. They should be construed so as best to promote the object which the Legislature had in view, if that can be done without doing violence to settled rules of construction. In the present case there is nothing in the circumstances disclosed tending to show that the act was not intended to operate, and should not be construed as operating as a grant." 182 Mass. at 81–82. The court concluded (later quoted with approval in *Commissioners of Pub. Works* v. *Cities Serv. Oil Co.*, 308 Mass. at 353): "The interests of the Commonwealth in navigation are carefully protected by limiting the extension to the harbor line, and by requiring that below low water the wharf shall be built on piles which shall be certain distances apart. It would seem plain that the Commonwealth intended to part with *all its rights* except so far as contained in the conditions on which the grant was made" (emphasis supplied). 182 Mass. at 82. See *Richard T. Green Co.* v. *Chelsea*, 149 F.2d 927, 932 (1st Cir.), cert. denied, 326 U.S. 741 (1945). Contrast *Commonwealth* v. *Roxbury*, 9 Gray at 499–500.

In *Treasurer & Recr. Gen.* v. *Revere Sugar Refinery*, 247 Mass. 483 (1924), the Supreme Judicial Court held that the provision in St. 1855, c. 481, § 1, requiring that the construction of a wharf below the low water mark be commenced within three years and completed within ten created a condition subsequent. The court then observed, "The breach of that condition would not of itself render the grant void and *revest the title* in the grantor" (empha-

sis supplied). 247 Mass. at 489. This statement thus assumes that the grant effected by St. 1855, c. 481, was one of title.

In *Haskell* v. *New Bedford,* 108 Mass. 208, 216 (1871), *Hamlin* v. *Pairpoint Mfg. Co.,* 141 Mass. 51, 57 (1886), and *Hastings* v. *Grimshaw,* 153 Mass. 497, 500–501 (1891), the Supreme Judicial Court interpreted St. 1806, c. 18,[8] as constituting a grant of "an interest in the soil," of "possessory title." 153 Mass. at 501, quoting the *Hamlin* case at 57. Further, in the *Haskell* case the court characterized the grantee under that statute as "being the owner in fee of a parcel of land and wharf in New Bedford . . . and of the dock and flats adjoining, under a deed made . . . by the devisees of John A. Parker ( . . . whose title extended, by virtue of the general ordinance of 1647 and of the special act of 1806, c. 18, to the channel of the river)." 108 Mass. at 209. Indeed, the Commonwealth concedes that the 1806 statute granted a fee simple title. The Commonwealth's attempt to distinguish that statute from the Lewis Wharf statutes is not persuasive. Though the lan-

---

[8] The statute is reproduced in *Haskell* v. *New Bedford,* 108 Mass. at 209. It provides: "SECTION 1. . . . That the owners and proprietors of lots of land adjoining Accushnett River, in the town of New Bedford . . . their heirs and assigns, shall be and hereby are authorized and empowered to erect, continue and maintain wharves . . . said wharves to extend to the channel of said river [and thus below the low water mark], if the owners of said lots think proper; and each owner of said lot shall have authority to provide docks or erect wharves as aforesaid on the aforesaid extended portion of his said lot, in such way and manner as he may think proper, not exceeding the limits of said channel of said river.

"SECTION 2. And be it further enacted, That if at any time hereafter it shall be made to appear to the satisfaction of the General Court of the Commonwealth of Massachusetts, that the erection, maintaining or continuing said wharves or docks, mentioned in the first section of this act, operates any obstruction to the navigation of said river, or to the right of taking shell or other fish in said river, in that case the said General Court shall have a right, notwithstanding this act, to make such provisions respecting the navigation of said river, and the right of taking said fish, as they may think the public interest requires."

guage used in the 1806 statute differs from that used in
the Lewis Wharf statutes, we see no difference, in sub-
stance, and the Commonwealth has pointed to none, be-
tween the reservations of rights in those statutes. Com-
pare St. 1806, c. 18, § 2 ("said General Court shall have
a right . . . to make such provisions respecting the naviga-
tion"), with the comparable provisos in the Lewis Wharf
statutes.[9] We also see no substantial distinction between
the powers given the Lewis Wharf corporation by St.
1834, c. 115, to "improve and manage said property, as to
them shall seem expedient" and the power given in the
1806 statute to "erect wharves . . . in such way and man-
ner as he may think proper." Nor is it of significance that
the words "heirs and assigns" used in the 1806 statute are
not found in the Lewis Wharf statutes. Reading the Lewis
Wharf statutes together, the grant was to a corporation
and thus words of limitation were unnecessary in order
to convey a fee. *Overseers of the Poor of Boston* v. *Sears*,
22 Pick. 122, 126 (1839). Swaim, Crocker's Notes on Com-
mon Forms § 93 (7th ed. 1955).

More generally, as the *Bradford* case (182 Mass. at 82)
indicates, the purpose and understanding of the Legisla-
ture in passing "[h]undreds of similar acts" before 1869
were the same, and the cases have made no attempt to
differentiate among them on the basis of minor semantic
distinctions. Thus too, Professor Rice in his study (see fn.
6) states generally that the pre-1869 "grants of authority
to erect structures or place fill in public tidelands were in
fact fee simple grants rather than mere licenses." 1971
House Doc. No. 4932, at 35. And in 1852 Senate Doc. No.
44, at 1, it is stated: "The grant as originally made, differs
not in any respect from other grants of flats to riparian
proprietors, by legislative acts. Similar grants have fre-

---

[9] The proviso in the Lewis Wharf statutes—absent in the 1806 stat-
ute—that the wharf shall be built on piles is immaterial since the
Commonwealth concedes that the Lewis Wharf corporation was em-
powered by the broad language in St. 1834, c. 115, to fill under the
wharf.

quently been made . . . ." But contrast *Treasurer & Recr. Gen.* v. *Revere Sugar Refinery*, 247 Mass. at 489, in which an express condition was made that the structure be completed in a specific time.

We are thus convinced that the Lewis Wharf statutes gave the petitioner's predecessors a fee simple title to area B. This appears from the consistent and sustained understanding of the Supreme Judicial Court in dealing with such statutes.

However, we do not believe that the cases negate a residual interest in the Commonwealth which affects the petitioner's title. Whether there is such a residual interest has not previously been squarely faced, and the Supreme Judicial Court has from time to time indicated that it remains an undecided question. Thus, in the three New Bedford cases (*Haskell* v. *New Bedford*; *Hamlin* v. *Pairpoint Mfg. Co.*; and *Hastings* v. *Grimshaw*) which on our analysis give strong support to the conclusion that the Lewis Wharf statutes grant a fee, the court reserved the question, saying in the *Hamlin* case: "Whether it [the statute] gave them an absolute fee without any restrictions . . . it is not necessary to consider in this case." 141 Mass. at 57. This is quoted in *Hastings* v. *Grimshaw*, 153 Mass. at 501, which in turn cites *Haskell* v. *New Bedford*, as being "to the same effect." Also, the *Bradford* case does not rule out "conditions on which the grant was made" although St. 1851, c. 26—which is almost identical with the 1832 and 1840 Lewis Wharf statutes—manifests "that the Commonwealth intended to part with all its rights." 182 Mass. at 82. Indeed, the court in *Bradford* was careful to point out (at 83) that it was "[c]onfining [itself] to the precise point before . . . [it] namely, whether, in view of the St. of 1851" the defendant was required to make compensation for the displacement of tidewater resulting from a filling made under that statute. Thus, too, in *Commercial Wharf Co.* v. *Winsor*, 146 Mass. 559, 564 (1888), the court characterized as real estate "the right [ ] given by the statute [St. 1832, c. 51, similar to the

1834 Lewis Wharf statute] authorizing its [the wharf's] extension"; yet the court found no inconsistency in its statement in the same case (at 563): "But the authority to extend the wharves gave no title to the flats not occupied by them when extended." See *Fitchburg R.R.* v. *Boston & Me. R.R.*, 3 Cush. at 88.

Turning specifically to the Lewis Wharf statutes, it is clear that the basic authorization was "to extend and maintain the said wharf into the harbor channel...." And that was their purpose. We need not in this proceeding attempt to decide just what is comprehended in that purpose—whether it is as broad as the "commercial purposes" referred to in 1852 Senate Doc. No. 44, at 1,[10] or as narrow as "to promote trade and commerce by enabling and encouraging the owners of flats to build wharves, warehouses, and other structures thereon for the use and convenience of those having occasion to resort to the ports and harbors...." *Bradford* v. *McQuesten*, 182 Mass. at 82. Compare *Fitchburg R.R.* v. *Boston & Me. R.R.*, 3 Cush. at 61, indicating some of the uses of a wharf in the 1840's. The record does not disclose the use presently being made of area B; and the Commonwealth does not in this proceeding complain that area B is now being used in a manner inconsistent with the purpose of the grant.

---

[10] See Report of the Commissioners for Fixing the Line of Private Property in Boston Harbor, 1840 Senate Doc. No. 8, at 14: "From the ratio of the increase of population in Boston and its environs, which the developments of the last half century have established, it is evident, that within the next like period of time, it will amount to nearly four hundred thousand; and as the peninsular portions of the city, yet unoccupied by edifices, are comparatively small, how is such a vastly augmented number of inhabitants to be accommodated with dwelling houses, and furnished with the stores, warehouses, manufactories, workshops, wharves and docks, which the immensely increased business will then render indispensable, except by extending the former over the surrounding highlands of Dorchester, Roxbury, Brighton, Brookline, Cambridge, Charlestown, Chelsea, East and South Boston, and reclaiming, as sites for the other establishments, the shoaler portions of the adjacent harbor."

What emerges is a legislative purpose for which the fee is granted. In the terminology of property law the Lewis Wharf statutes constitute the grant of a fee simple subject to a condition subsequent which effectuates the purpose of the grant. See *Treasurer & Recr. Gen.* v. *Revere Sugar Refinery*, 247 Mass. at 488–490; Restatement of Property § 45 (1936); Moynihan, Real Property at 35–37 (1962). It is true, of course, that generally words declaring the purpose for which a grant is made are insufficient by themselves to create a condition subsequent when used in the deeds of private persons. *Rawson* v. *School Dist. in Uxbridge*, 7 Allen 125, 128–129 (1863). *Battelle* v. *New York, N.H. & H.R.R.*, 211 Mass. 442, 444 (1912). *Wakefield* v. *Attorney Gen.*, 334 Mass. 632, 633–634, 636 (1956). Swaim, Crocker's Notes on Common Forms § 280 (7th ed. 1955). However, "[i]n grants from the crown . . . a conditional estate may be created by the use of words which declare that it is given . . . for a certain purpose, or with a particular intention . . . . But this rule is applicable only to those grants or gifts which are purely voluntary, and where there is no other consideration moving the grantor or donor besides the purpose for which the estate is declared to be created." *Rawson* v. *School Dist. in Uxbridge*, 7 Allen at 128. See 1 Tiffany, Real Property § 192, at 313 (3d ed. 1939), and Annot., 116 A.L.R. 76, 81 (1938). In this case, the Commonwealth's grants to the petitioner's predecessor in title appear to have been purely voluntary grants for which the Commonwealth expected to receive no consideration other than the public benefits to navigation and commerce which it was believed would result from the extension of Lewis Wharf. Our analysis accords with the "familiar rule, that grants made by the government are to be construed in favor of the grantor, and this is especially true when [as here] they affect the interests of the people which are held in trust by the government." *Proprietors of Mills on Monatiquot River* v. *Commonwealth*, 164 Mass. 227, 233–234 (1895). *Boston Elev. Ry.* v. *Commonwealth*, 310 Mass. 528, 564 (1942). *Prudential*

*Ins. Co.* v. *Boston*, 369 Mass. 542, 547 (1976). See as an analogy *Gould* v. *Greylock Reservation Commn.*, 350 Mass. 410, 419 (1966), and *Sacco* v. *Department of Pub. Works*, 352 Mass. 670, 672 (1967), which hold that a grant for a specific public purpose is to be narrowly construed to exclude other public purposes.

The conclusion we have reached may cause some uncertainty in the development of Boston Harbor and areas similarly situated. But that is the result of the changes in the uses contemplated for the harbor which may constitute an abrupt departure from the former course of development. If, indeed, the late Twentieth Century presages a use of the harbor quite different from that contemplated in the early Nineteenth Century, then perhaps what is called for is a legislative reexamination.

Accordingly, the decision of the Land Court is to be modified to include our holding that the Lewis Wharf statutes granted a fee simple in area B subject to a condition subsequent that it be used in accordance with the purpose expressed in those statutes.

*So ordered.*