# OPINIONS OF THE JUSTICES.

## Opinions of the Justices to the Senate.

*Harbors. Real Property,* Restriction, Littoral property. *Constitutional Law,* Opinions of the Justices, Public purpose, Delegation of powers, Equal protection of laws, Environmental protection. *Due Process of Law,* Commonwealth's interest in tidelands. *Supreme Judicial Court,* Opinions of the Justices. *Public Land.*

The public interest in flats reclaimed pursuant to lawful authority may be extinguished, and, if deemed appropriate, the Legislature may act to declare that those rights have been extinguished so as to assure the marketability of title to such property. [902-903] Liacos, J. & Abrams, J., concurring.

The Legislature has authority to surrender any residual public rights in lawfully filled, formerly submerged land; however, such authority is not without limits and must be exercised for a valid public purpose. [903-906] Liacos, J., & Abrams, J., dissenting.

The Legislature could properly enact legislation which expressed a general principle of construction with respect to any grant, license, deed, special or general act or any other instrument by the Commonwealth or a political subdivision purporting to create rights in waters of the Commonwealth located within the city of Boston and situated below the primitive mean high water mark or in land thereunder, in so far as that construction may be applied to the Commonwealth's relinquishment of relatively insignificant, potentially implied interests in land; however, this court could not now say whether in a given case the implied interest in fact might be so substantial as not to have received the necessary specific indication of legislative attention or whether the Commonwealth's abandonment of a specific interest would serve a valid public purpose. [906-908]

The Legislature may properly enact legislation to eliminate any public trust rights of the Commonwealth in the substantially landlocked former flats and submerged land lying landward of a certain line shown on a plan of the city of Boston. [908-911]

The Legislature may properly enact proposed legislation permitting the Secretary of the Executive Office of Environmental Affairs to release and extinguish any vestigial rights of the Commonwealth in tidelands lying seaward of a certain line shown on a plan of the city of Boston, and, as to flats generally and as limited to vestigial rights in submerged land as to which an ownership interest has already been acquired by legislative authorization, the proposed standards to guide the Secretary

are constitutionally adequate to define the limits of his exercise of the authority that would be delegated by the enactment. [911-914]

The Justices asked to be excused from answering questions propounded to them by the Senate as to the effect, construction, and future application of certain pending legislation. [914-916]

Proposed legislation relinquishing the Commonwealth's residual interests in tidelands in the city of Boston, as construed by this court, would not contravene due process of law guaranties of the Fourteenth Amendment to the United States Constitution or art. 10 of the Massachusetts Declaration of Rights; the Justices, however, asked to be excused from answering a question propounded to them by the Senate as to whether the legislation would violate equal protection principles. [916-917]

Although the Justices expressed some reservations concerning the proper interpretation of certain portions of proposed legislation which would relinquish the Commonwealth's residual interests in certain tidelands in the city of Boston and recognized that in certain applications the act might not comport with constitutional requirements, the Justices concluded that the bill, if enacted into law, would not exceed the powers of the General Court and, therefore, would not be in contravention of Part II, c. 1, § 1, art. 4 of the Massachusetts Constitution. [917] Liacos, J., & Abrams, J., dissenting.

Insofar as proposed legislation relinquishing the Commonwealth's residual interests in tidelands in the city of Boston involved the disposition of any land or easement owned by the Commonwealth, art. 97 of the Articles of Amendment to the Massachusetts Constitution would require that the act be approved by a two-thirds vote of both branches of the General Court. [917-919]

Proposed legislation which would authorize the Secretary of the Executive Office of Environmental Affairs to release and extinguish vestigial rights of the Commonwealth in tidelands in Boston seaward of a certain line shown on a plan of the city if the secretary found that the present or proposed use would serve a proper public purpose and not be detrimental to the public navigation of the remaining waters of Boston Harbor would not constitute an unlawful delegation of the Legislature's responsibility. [919-921] Liacos, J., & Abrams, J., dissenting.

On June 18, 1981, the judges submitted the following answers to questions propounded to them by the Senate.

To the Honorable the Senate of the Commonwealth of Massachusetts:

The undersigned Justices of the Supreme Judicial Court respectfully submit these answers to the questions set forth in an order adopted by the Senate on February 5, 1981, and transmitted to us on February 13, 1981. The order recites that there is pending before the General Court a bill entitled, "An Act relative to title to tidelands lying within the city of Boston and bordering on or near the waters of the commonwealth." (Senate No. 1001.)

The emergency preamble proposed for Senate No. 1001 states that the purpose of the act is to provide immediate certainty "as to titles to certain lands lying within the city of Boston, and bordering on or near the waters of the commonwealth, which bear clouds by implication of conditions applicable thereto not expressly set forth in any license, act, or other instrument, or otherwise." The preamble further recites that these "clouds seriously affect the value of such existing land and structures and cause serious impediments to the marketing and financing of improvements to such lands." We note that a similar bill was before the Senate during the previous session of the Legislature, that questions identical to those now propounded to us were then propounded to the Justices of this court, that the legislative session ended before the Justices rendered their opinion, and that, in the absence of a solemn occasion, the Justices were obliged to decline to answer the questions. See *Answer of the Justices*, 382 Mass. 694, 697 (1981).

Section 1 of the bill proposes to amend G. L. c. 184, by inserting a new § 23A, concerning the construction of instruments, including legislation, that purport to create rights in the waters of the Commonwealth, and underlying lands, in Boston, situated below the mean high water mark. Section 2 of the bill proposes to insert a new c. 91A of the General Laws concerning ownership interests in tidelands, defined by proposed G. L. c. 91A, § 3, as areas below the primitive mean high tide in Boston. The new chapter would .deal separately with any "vestigial interest of the commonwealth" in tidelands lying landward of a specified line (defined as the "1980 Line") and with the Common-

wealth's "vestigial rights," as defined in proposed G. L. c. 91A, § 2, in tidelands lying seaward of that line. The 1980 Line, see Appendix A, is drawn along major Boston thoroughfares generally as follows: Massachusetts Avenue, Storrow Drive, Charles Street, the access to the Fitzgerald Expressway, the Fitzgerald Expressway, east to Commercial Street, then along Atlantic Avenue and Albany Street. Speaking generally, proposed § 2 undertakes to eliminate any vestigial interest of the Commonwealth in tidelands lying landward of the 1980 Line which have been or are hereafter filled pursuant to the express language of any instrument, including a legislative act. Again in general terms, proposed G. L. c. 91A, §§ 4 and 5, set forth procedures by which, on application of a record owner of an interest in such tidelands, the Secretary of the Executive Office of Environmental Affairs may release and extinguish the Commonwealth's vestigial rights in tidelands lying seaward of the 1980 Line.

The order transmitted to us asserts that grave doubt exists as to the constitutionality of Senate No. 1001 if enacted into law and propounds the following questions:

"1. Would section one of said senate bill, if enacted, cure title and eliminate any vestigial rights of the commonwealth, whether by way of implied condition, public trust or otherwise, in and to any and all tidelands or submerged lands located within the city of Boston?

"2. Would section two of said senate bill, if enacted, cure title and eliminate any vestigial rights of the commonwealth, whether by way of implied condition, public trust or otherwise, in and to any and all tidelands or submerged lands located within the city of Boston lying landward of the 1980 Line and

"a. filled by private or public entities or persons pursuant to general or special legislation containing no express conditions restricting use; or

"b. filled by private or public upland landowners pursuant to authority contained in the Colonial Or-

dinances of 1641-1647 prior to the effective date of St. 1866, c. 149, requiring the licensing of any such fill; or

"c. filled pursuant to licenses granted by the Board of Harbor Commissioners or its successor agencies pursuant to St. 1866, c. 149, as amended and now in law as chapter ninety-one of the General Laws, either where such licenses contain no express language of condition or where there is express language of condition; or

"d. which have been both continuously filled and privately occupied for a period of twenty years beginning after the effective date of Revised Statutes, Chapter 119, Section 12 (effective April 30, 1836) and creating a twenty year statute of limitations affecting real estate interests of the commonwealth and ending before the effective date of St. 1867, c. 275 (effective May 27, 1867), and purporting to exempt interests of the commonwealth in lands below the line of primitive mean high water from the application of any statute of limitations; or

"e. filled by the commonwealth or one of its agencies or political subdivisions or bodies politic and corporate pursuant to the provisions of general or special legislation, and thereafter, conveyed to private landowners either for consideration or without consideration?

"3. Would said bill, if enacted into law, be in contravention of Section one of Article XIV of the Amendments to the Constitution of the United States, or Article X of Part the First of the Constitution of the Commonwealth, guaranteeing due process and equal protection of the laws?

"4. Would said bill, if enacted into law, be in contravention of Article IV, Section one, of Chapter one, of Part the second of the Constitution of the Commonwealth, as exceeding the power of the General Court to make all manner of wholesome and reasonable [statutes]?

"5. Would said bill, if enacted into law, require a two-thirds vote of both branches of the General Court [under] Article XCVII of the Articles of Amendment of the Constitution of the Commonwealth?

"6. Would the said bill, if enacted into law, be an unlawful delegation of legislative power and responsibility to regulate the public trust over certain tidelands in violation of Article XCVII of the Articles of Amendment, or Article XXX of Part the First of the Constitution of the Commonwealth?"[1]

Before dealing with the specific questions that have been propounded to us, we shall consider generally both the nature of the interests in tidelands with which Senate No. 1001 is concerned and the extent of the authority of the Legislature to dispose of or to relinquish the interests of the public in those tidelands. We shall next analyze Senate No. 1001 in light of the applicable principles of law, and finally we shall give our responses or answers to the six questions that have been propounded to us.

### General Considerations

It is clear that Senate No. 1001 was drafted to address concerns with respect to the title to, and the use of, property in the city of Boston lying below the primitive mean high water mark. These concerns appear to be a response, at

---

[1] We invited interested persons to file briefs by March 31, 1981. In response, briefs were filed by the Attorney General, the Bostonians for Leaving an Open Waterfront and the Boston Waterfront Neighborhood Association, the Committee on Civic Rights of the Friends of the Newburyport Waterfront, and the Conservation Law Foundation of New England, Inc., and also by the Abstract Club, the Massachusetts Conveyancers' Association, and the Real Estate section of the Boston Bar Association, which are voluntary associations of members of the Bar of the Commonwealth, whose practices and professional interests are principally concerned with the law relating to real property. The professional corporation of Rackemann, Sawyer & Brewster, which is engaged in the private practice of law in Boston, a substantial portion of whose practice is devoted to the area of real property law, also submitted a brief.

least in part, to the opinion of the Supreme Judicial Court in *Boston Waterfront Dev. Corp.* v. *Commonwealth*, 378 Mass. 629 (1979), agreeing with the formulation adopted by the Appeals Court in *Boston Waterfront Dev. Corp.* v. *Commonwealth*, 6 Mass. App. Ct. 214 (1978), concerning the consequences of legislative grants with respect to Lewis Wharf. The *Boston Waterfront* case involved the nature of the petitioner's ownership interest in a portion of Lewis Wharf lying below the historic low water mark. The Supreme Judicial Court held, with one of the five Justices on the panel dissenting, that the petitioner held title to the disputed area of the wharf in fee simple, but subject to the condition subsequent that it be used for the public purposes for which it was granted. *Boston Waterfront Dev. Corp.* v. *Commonwealth, supra* at 649.

It should be noted that the *Boston Waterfront* case involved the owner's rights in submerged land (generally, land lying below the historic mean low water mark) and not in flats (land lying between the mean high water line and the mean low water line or a line 100 rods from the mean high water line, whichever is the lesser). See *Opinion of the Justices*, 365 Mass. 681, 684-686 (1974), discussing the colonial ordinance of 1641-1647 as to the relative rights of the public and upland property owners in flats. Further, it is obvious that the *Boston Waterfront* case concerned the consequences of the Lewis Wharf statutes, statutes which did not undertake by their express terms to transfer all the Commonwealth's or the public's interests in the disputed land to the petitioner's predecessors in title. Consequently, the court was not concerned with the right of the Legislature to surrender such interests if it so desired.

We do not read the *Boston Waterfront* decision as resting on the premise that the Legislature lacks the power under constitutional principles to transfer all the interests of the public and of the Commonwealth in tidelands. Thus, although the land in dispute in the *Boston Waterfront* case was impressed with a public trust in the circumstances, the court did not pass on, or even discuss, the validity of any

legislative attempt to surrender or to relinquish such a residual public interest.

Senate No. 1001 is drafted on the assumption that the Legislature has the right to abandon or relinquish such a public trust in favor of private landowners. Several of the questions propounded to us concern the validity of that basic assumption. We believe that, acting consistently with appropriate limitations which we discuss subsequently, the Legislature has the power to transfer or relinquish the Commonwealth's and the public's interests in tidelands within the Commonwealth. See *Commonwealth* v. *Boston Terminal Co.*, 185 Mass. 281, 283-284 (1904); *Nichols* v. *Boston*, 98 Mass. 39, 42 (1867). Of course, whether any such transfer or relinquishment should occur, and under what conditions beyond those mandated by constitutional considerations, is a matter for the Legislature, and not the Justices of this court, to determine. See *Opinion of the Justices*, 368 Mass. 880, 886 n.1 (1975). Our conclusion is simply that the transfer or relinquishment of all the Commonwealth's and the public's rights in tidelands is not constitutionally beyond the power of the Legislature.

We discuss first the nature of the public's rights in flats, the area between mean high water and mean low water (or 100 rods from mean high water, if lesser). Here the public rights are of a limited nature. See *Opinion of the Justices*, 365 Mass. 681, 687 (1974). A so called "littoral owner may build on his tidal land so as to exclude the public completely as long as he does not unreasonably interfere with navigation." *Id.* See *Old Colony St. Ry.* v. *Phillips*, 207 Mass. 174, 179 (1911); *Commonwealth* v. *Alger*, 7 Cush. 53, 74-75 (1851); *Drake* v. *Curtis*, 1 Cush. 395, 413 (1848). It appears, therefore, that the public interest in flats reclaimed pursuant to lawful authority may be extinguished, and, if deemed appropriate, the Legislature may act to declare that those rights have been extinguished so as to assure the marketability of title to such property. Of course, until there has been a lawful filling of flats, the littoral owner owns them subject at least to the reserved public rights of

fishing, fowling, and navigation. See *Opinion of the Justices*, 365 Mass. 681, 685-687 (1974). The *Boston Waterfront* case made no change in the law governing the ownership or development of flats.

As to submerged lands, which may be described as land lying seaward of flats, no littoral landowner or anyone else has any special rights unless granted them by the Legislature. The *Boston Waterfront* opinion acknowledged that the Legislature may grant interests, even a fee simple, in submerged land and in the waters above submerged land. We accept, as we must,[2] the holding of that case that the submerged land there in dispute, on which structures had been placed with legislative authorization, was granted subject to the condition that it be used for the public purpose or purposes of the authorizing legislation and, if it is not so used, the Commonwealth has a right to enter and repossess the property. *Boston Waterfront Dev. Corp.* v. *Commonwealth, supra* at 649.

The holding in the *Boston Waterfront* case does not appear to rest on any provision of the State or Federal Constitutions. Its conclusion was based on a consideration of common law principles and of statutory provisions. The general view in this country is that constitutional considerations do not bar legislative grants of absolute rights in submerged lands, although a gross or egregious disregard of the public interest would not survive constitutional chal-

---

[2] The role of the Justices in answering questions submitted to them for an advisory opinion is set forth in *Opinion of the Justices*, 226 Mass. 613, 617 (1917), as follows: "It is established also that in answering questions submitted to them under c. 3, art. 2 of the Constitution, the Justices of this court are bound by the decisions of the court upon matters respecting which that court is the final authority. It is not open to the Justices in answering questions submitted to them under the Constitution to attempt to overrule a decision made by the court in a cause between party and party or to speculate upon the correctness of such a decision. If such a decision is to be overruled, it can be only after argument in another cause between party and party, where the rights of all can be fully guarded. It cannot be overturned by an advisory opinion of the Justices given without the benefit of argument."

lenge.[3]  In our opinion, the Legislature has authority to surrender any so called vestigial or residual public rights in lawfully filled, formerly submerged, land.  The discussion in the *Boston Waterfront* opinion of the claim that the Commonwealth lost any right of reentry as to the property involved in that case by failing to comply with G. L. c. 260, § 31A, in effect a statute of limitations, indicates that the court thought that such an interest might be lost as the re-

---

[3] Speaking of submerged lands within the Commonwealth in *Commonwealth* v. *Boston Terminal Co.*, 185 Mass. 281, 283-284 (1904), the court said that the sovereign "can by way of grant pass its interest [both its proprietary rights and the public interest held in trust] by act of the Legislature in lands that are below extreme low water mark, and which when filled by the grantee will extinguish the right of user by the public." We discuss subsequently limitations on the exercise of the Legislature's power.

Commentators have concluded that it is within the power of a Legislature to grant private rights in public trust properties where the conveyance serves the public interest. See, e.g., Wyche, Tidelands and the Public Trust:  An Application for South Carolina, 7 Ecology L.Q. 137, 162 (1978); Deveney, Title, Jus Publicum and the Public Trust:  An Historical Analysis, 1 Sea Grant L.J. 13, 60 (1976); David A. Rice, Final Report:  A Study of the Law Pertaining to the Tidelands of Massachusetts, 1971 House Doc. No. 4932, at 62; Nelson, State Disposition of Submerged Lands Versus Public Rights in Navigable Waters, 3 Nat. Resources Law 491, 499 (1970); Sax, The Public Trust Doctrine in Natural Resource Law:  Effective Judicial Intervention, 68 Mich. L. Rev. 473, 489-491 (1970).

The United States Supreme Court has recognized the power of a State to part with its public and private rights in submerged lands. See *Appleby* v. *City of New York*, 271 U.S. 364, 397-399 (1926). There may, of course, be "a gross perversion of the trust over the property under which it is held, and abdication of sovereign governmental power." *Id.* at 393. The Supreme Court was speaking of the circumstances of *Illinois Cent. R.R. Co.* v. *Illinois*, 146 U.S. 387 (1892) (four to three decision). The *Illinois Cent.* decision upheld the repudiation by the Illinois Legislature of its purported grant to a private corporation of more than 1,000 acres of the harbor of the city of Chicago, comprising virtually the entire commercial waterfront. The railroad challenged that repudiation as a violation of rights protected under the contract clause of the Constitution of the United States. The Supreme Court did not rule, however, that the public had "some inalienable and indefinable residue of water resources which is beyond the power of the states to convey for valid purposes." Deveney, Title, Jus Publicum and the Public Trust: An Historical Analysis, 1 Sea Grant L.J. 13, 60 (1976).

sult of even a general legislative enactment. *Boston Waterfront Dev. Corp.* v. *Commonwealth, supra* at 651-652. If the Commonwealth could not abandon its public trust in submerged lands by legislation, the discussion in the *Boston Waterfront* opinion of the possibility that the Commonwealth no longer had an interest in the submerged land involved in that case would have been wholly unnecessary.

The authority of the Legislature to abandon, release, or extinguish the public interest in submerged land is not without limits. Where the Commonwealth has proposed the transfer of land from one public use to another, the legislation must be explicit concerning the land involved; it must acknowledge the interest being surrendered; and it must recognize the public use to which the land is to be put as a result of the transfer. See *Brookline* v. *Metropolitan Dist. Comm'n,* 357 Mass. 435, 440 (1970); *Robbins* v. *Department of Pub. Works,* 355 Mass. 328, 330 (1969); *Sacco* v. *Department of Pub. Works,* 352 Mass. 670, 672 (1967); *Gould* v. *Greylock Reservation Comm'n,* 350 Mass. 410, 419-422 (1966); *Higginson* v. *Treasurer & School House Comm'rs of Boston,* 212 Mass. 583, 591-592 (1912). Similar principles properly apply to any relinquishment or surrender of a public interest in real estate.

A further and significant limitation on legislative action in the disposition of a public asset is that the action must be for a valid public purpose, and, where there may be benefits to private parties, those private benefits must not be primary but merely incidental to the achievement of the public purpose. See *Opinion of the Justices,* 368 Mass. 880, 885 (1975), and cases cited. "The paramount test should be whether the expenditure confers a direct public benefit of a reasonably general character, that is to say, to a significant part of the public, as distinguished from a remote and theoretical benefit," *Opinion of the Justices,* 337 Mass. 777, 781 (1958), and whether the "aspects of private advantage . . . are reasonably incidental to carrying out a public purpose in a way which is within the discretion of the Legislature to choose." *Court St. Parking Co.* v. *Boston,* 336 Mass.

224, 231, appeal dismissed sub nom. *Rosengard* v. *Boston*, 355 U.S. 272 (1957) (per curiam). The question whether a particular legislative act, or an administrative decision pursuant to statutory authorization, serves a public purpose is for the Legislature to determine, and, although that legislative determination is entitled to great deference, it is not wholly beyond judicial scrutiny. See *Blakeley* v. *Gorin*, 365 Mass. 590, 598-599 (1974). The definition of public purpose set forth in § 3 of proposed G. L. c. 91A is very broad.[4] We cannot say whether in every conceivable circumstance governed by G. L. c. 91A the requirement of a proper public purpose would be met by the circumstances defined as a public purpose in proposed § 3. As to the origin, scope, and development of public purpose, see *Massachusetts Home Mortgage Fin. Agency* v. *New England Merchants Nat'l Bank*, 376 Mass. 669, 676-684 (1978).

## *The Specific Provisions of Senate No. 1001*

We turn then to a discussion of the provisions of the proposed act in light of the general considerations we have just set forth.

Section 1 of Senate No. 1001 proposes to amend G. L. c. 184, which deals generally with real property, by inserting after § 23 the following section: "*Section 23A*. No condition, restriction or limitation on use shall be deemed to be created, or to have been created, by, or shall be implied from, any grant, license, deed [*sic*] special or general act or any other instrument by the commonwealth or any political subdivision, independent agency or body politic and corporate thereof or any predecessor of any of them purporting to create rights in waters of the commonwealth located within the city of Boston situated below the primitive mean

---

[4] Proposed § 3 defines "public purpose" as follows: "'Public purpose', any commercial, industrial, business, residential [*sic*] conservation or other purpose for which any real estate has been, could now be, or may in the future be lawfully used pursuant to regulations or laws from time to time applicable in the city of Boston."

high water mark or in land thereunder, whether or not such land is public or privately owned, unless such condition, restriction or limitation of use is or was expressly set forth in the dispositive provisions of such instrument."

Section 23A expresses a legislative intention concerning the construction of legislative acts, deeds, and other instruments by which the Commonwealth, or a political subdivision or agency, purported, or hereafter purports, to create rights in waters and lands of the Commonwealth situated below the primitive mean high water mark in Boston. No condition, restriction, or limitation is to be implied or deemed created by any such instrument unless it is expressly set forth.

As to any instrument effective after the enactment of such a provision, a statement of the standard by which that instrument is to be construed seems an appropriate expression of legislative intent for the guidance of courts. If that subsequent instrument is a legislative act, the intention of the Legislature that passed the act would be controlling, but proposed § 23A could be a significant factor in making a determination of that intent.

Proposed § 23A purports to apply to prior instruments and, in doing so, it appears to intend that no such instrument should be construed to contain an implied condition, restriction, or limitation. In this sense, § 23A could be taken to be a present relinquishment or transfer of an interest of the Commonwealth that otherwise might impliedly be reserved. The stated purpose of § 23A that landowners having rights in tidelands have a clear indication of the nature of their interest or title is of substantial public interest. The avoidance of litigation over implied conditions, restrictions, or limitations is an appropriate legislative objective. We construe the words "condition, restriction or limitation on use" as concerned with interests in land less substantial than easements (easements of necessity, for example). As a statement of a general principle of construction, applicable to relatively insignificant, potentially implied interests in land lying below mean high water in

Boston, we accept the propriety of such an enactment. We cannot now say, however, whether, in a given case, the implied interest in fact would be so substantial as not to have received the necessary specific indication of legislative attention, or whether the Commonwealth's abandonment of a specific interest would serve a valid public purpose.

We observe that proposed § 23A addresses the subject of conditions, restrictions, or limitations implied from an instrument. The interest retained by the Commonwealth in the submerged land involved in the *Boston Waterfront* case may be said to have existed, not from an implication in the Lewis Wharf legislation, but from the failure of that legislation to make a complete grant of the Commonwealth's and the public's entire interest in the property. Thus, if § 23A is designed to deal with the kind of interest said to have been retained by the Commonwealth in the *Boston Waterfront* case, it may not achieve that purpose.

Section 2 of Senate No. 1001 proposes a new chapter 91A of the General Laws. Section 1 of that chapter contains a series of legislative findings concerning a variety of subjects: (1) the free transferability, marketability, and mortgageability of real estate in Boston is crucial; (2) the retention by the Commonwealth of title or vestigial rights, by other than express language in the instrument of transfer, would render such real estate unmarketable and incapable of development; (3) savings institutions as a matter of policy should principally invest in fee simple titles subject to no unreasonable conditions or exceptions; (4) the nature and volume of maritime commerce has made large areas of present and former littoral properties in Boston unfit and unnecessary for purposes directly connected with maritime commerce and many of these areas have become blighted and of little or no functional use; (5) such waterfront areas may be used for various purposes without harm to public navigation of the remaining waters of the Commonwealth, and freeing that property from any title impediment restricting the use of that property to maritime commerce or any similarly limited purpose would compensate the Com-

monwealth for any detriment to Boston Harbor; (6) clouds on title arising from asserted vestigial interests of the Commonwealth in some or all of present or former littoral properties would prevent development of the type which has aided in the economic revival of Boston and would stultify growth and further reduce the tax base of the city; (7) the public welfare would be best served by creating certainty of titles and by eliminating "unexpressed, implied, imputed, or implicit rights or conditions retained by the Commonwealth"; (8) the proposed act will eliminate the need for the public to examine documents not recorded in the registry of deeds as to vestigial rights of the Commonwealth and will eliminate the need for a succession of special acts dealing with individual properties; (9) the elimination of vestigial rights of the Commonwealth, its political subdivisions and agencies, in such lands would best serve the present and future interest of the Commonwealth; and (10) any contrary, prior legislative declaration of public purpose is no longer in the best interests of the Commonwealth.

Section 2 of proposed G. L. c. 91A deals with tidelands lying landward of the 1980 Line. It provides that tidelands, as defined in proposed G. L. c. 91A, § 3, lying landward (within Boston) of the 1980 Line which have been or are hereafter filled pursuant to the express language of any applicable grant, legislation, or other instrument of the Commonwealth, its political subdivisions or agencies, are declared to be for the proper public purpose of promoting the commercial, industrial, residential, conservation and recreational development of Boston. It further provides that "any vestigial interest of the commonwealth in the title to all such tidelands are [sic] hereby eliminated."

We observe, as we did earlier in this reply (see *supra* at 906), that "public purpose" is defined by proposed § 3 broadly to include all lawful land uses. This definition is so broad as to raise doubts as to its acceptability in all instances. Moreover, it does not expressly include as a public purpose some of the considerations recited in the legislative findings paraphrased above from proposed § 1 of G. L.

c. 91A.  In our consideration of proposed § 2, we need not pause concerning this definition because § 2 requires that the uses be *proper* public purposes.  As to former flats and submerged land lying landward of the 1980 Line, we have no hesitancy in accepting the legislative conclusion that it is substantially in the public interest that such land be free from any claim of a public trust and any other vestigial interest of the Commonwealth.  Neither the public nor the Commonwealth has a continuing interest in these tidelands in the nature of a public trust of the character described in the *Boston Waterfront* case.  See *Boston Waterfront Dev. Corp.* v. *Commonwealth, supra* at 641-649.

Section 2 of proposed G. L. c. 91A purports to eliminate "any vestigial interest of the commonwealth" in the tidelands landward of the 1980 Line.  It does not purport to eliminate the rights of particular individuals or any rights of the city of Boston.  It refers to "vestigial interests," which are not defined in proposed G. L. c. 91A.  We assume that vestigial interests are not necessarily the same as "vestigial rights," which are defined in proposed § 3.  We cannot say what interests of the Commonwealth, if any, beyond public trust rights are intended to be eliminated by the enactment of proposed § 2.  We would not regard an easement in favor of the Commonwealth or other right of the Commonwealth expressly stated in the governing instrument as a vestigial interest within the reach of proposed § 2.  We conclude, however, that proposed § 2 properly may eliminate any public trust rights of the Commonwealth in the substantially landlocked former flats and submerged land lying landward of the 1980 Line.

Proposed G. L. c. 91A treats land lying seaward of the 1980 Line differently.  There is no blanket relinquishment of the Commonwealth's vestigial rights or interests in tidelands seaward of that line.  There is, of course, a public interest in resolving any uncertainty as to title to those tidelands.  As we have said, the Legislature may properly declare that the Commonwealth has no continuing interest in lawfully filled flats.  As to lawfully filled, submerged land,

appropriate consideration must be given to the identity of the land, the nature of the Commonwealth's (and the public's) continuing interest, if any, in that land, and the use to which that land is or may be put. As to land seaward of the 1980 Line, proposed G. L. c. 91A proceeds more cautiously than it does as to landward property. Sections 4 and 5 provide for the exercise of individual judgments on a parcel by parcel basis, where both the public interest and the nature of the interests to be surrendered can be considered, all subject to judicial review.

Section 4 of proposed G. L. c. 91A authorizes the Secretary of the Executive Office of Environmental Affairs to release and extinguish any vestigial rights of the Commonwealth in tidelands seaward of the 1980 Line. He must hold a public hearing and notice must be given of the hearing. The hearing will be subject to the provisions of the State Administrative Procedure Act (G. L. c. 30A). See proposed G. L. c. 91A, § 6. The hearing can be initiated only by a record owner of an interest in the property. As to submerged lands, that person would already have acquired an interest that had been granted by legislative authority. As to flats, the petitioner presumably would have an interest in the upland property or an interest acquired as the result of legislative action. These circumstances are important in assessing precisely the scope of proposed § 4.

We note that the definition of "vestigial rights" in § 3 of proposed G. L. c. 91A deals in part with rights created by or implied from a grant, deed, legislative act or other instrument from the Commonwealth, a political subdivision or agency and not expressly set forth in the dispositive provisions of the instrument.[5] In this respect, the nature of the

---

[5] Proposed G. L. c. 91A, § 3, defines vestigial rights as follows: "'Vestigial rights', rights which have been or are hereafter created by or may be implied from, any grant, charter, license, deed, special or general act, or other instrument, by the commonwealth or any political subdivision, independent agency or body politic and corporate thereof or any predecessor of any of them purporting to create rights in waters or tidelands of the commonwealth situated seaward of the 1980 Line and below the primitive mean high water mark which vestigial rights have not been ex-

Commonwealth's interest is much like that dealt with in
proposed § 1 of Senate No. 1001, inserting a new G. L.
c. 184, § 23A. However, the definition of "vestigial rights"
continues, unlike proposed § 23A, and includes "any other
continuing right of the commonwealth to title to any such
[i.e. seaward] tidelands." Standing alone, this reference to
"other continuing rights" could be construed to include all
rights of the Commonwealth in the tidelands, whether or
not related to property as to which ownership interests had
been already created by legislative authorization. How-
ever, in the context of proposed G. L. c. 91A, we would not
be inclined to give such a broad reading to this language.
This is particularly so because proposed § 4 deals with
vestigial rights in property in which a record owner already
has acquired a lawful interest. There must have been a
grant, conveyance, or transfer of an interest in submerged
land before the concept of vestigial rights within § 4 can
become operative. While we cannot say with confidence
that every "continuing right of the commonwealth" of
whatever character may properly be the subject of a pro-
ceeding under proposed § 4, we have no hesitancy in saying
that a public trust interest of the character described in the
*Boston Waterfront* case and the public's interest in naviga-
tion, fishing, and fowling on flats may properly be consid-
ered for release and extinguishment in such a proceeding.[6]

If the Secretary, or his designee, in conducting a § 4 pro-
ceeding makes certain findings, he is directed to release and

---

pressly set forth as a condition, restriction, or limitation on use in the
dispositive provisions of such instrument; or any other continuing right of
the commonwealth to title to any such tidelands, however derived."

[6] Article 49 of the Amendments to the Constitution of the Common-
wealth, as amended by art. 97 of the Amendments, states that "the pro-
tection of the people in their right to the conservation, development and
utilization of the agricultural, mineral, forest, water, and air and other
natural resources" is a public purpose. We accept the Legislature's
authority in balancing the various public interests and public purposes to
conclude that the public purpose set forth in art. 97 of the Amendments is
overcome by other public purposes achieved by the extinguishment of
vestigial rights of the character dealt with in proposed § 4.

extinguish the Commonwealth's vestigial rights. He would have no authority to release or extinguish the rights of any other governmental unit or any private person. He, of course, could not waive or extinguish various Federal requirements and restrictions concerning navigable waters. See, e.g., The Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq. (1976); The Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. §§ 401-415 (1976). The Secretary could not grant any waiver of various State regulations, including wetlands protection (see G. L. c. 131, §§ 40, 40A, and associated regulations), the protection of coastal wetlands (see G. L. c. 130, § 105, and associated regulations), and environmental protection (G. L. c. 30, §§ 61-62H).[7] The decision of the Secretary is subject to judicial review (see proposed § 6 of G. L. c. 91A) and that review may include a consideration of the reasonableness of any conditions imposed and the reasonableness of the absence, if any, of any conditions.

The Secretary, acting under proposed § 4, must determine whether the uses to which the record owner is putting or proposes to put his property "serves or will serve a *proper* public purpose" (emphasis supplied). He must find that the use or proposed use will not be detrimental to the public navigation of the remaining waters of the Commonwealth or the port of Boston or Boston Harbor. He may impose reasonable conditions, including the payment of reasonable compensation to the Commonwealth and a requirement that the public have access to the water. See proposed § 5.

"It is well established in this Commonwealth and elsewhere, that the Legislature cannot delegate the general

---

[7] Filling activities have been and now are extensively regulated. See St. 1866, c. 149; St. 1869, c. 432; St. 1872, c. 236, and G. L. c. 91. See also G. L. c. 130, § 27A.

Under G. L. c. 91, §§ 2 and 3, the Department of Environmental Quality Engineering is charged with broad responsibility for lands, rights in lands, flats, shores and rights in the tidewaters belonging to the Commonwealth, in particular, Boston Harbor. See also G. L. c. 91A (creating the Port of Boston Commission). Senate No. 1001, in proposing to insert a new G. L. c. 91A, does not appear to intend to repeal the existing G. L. c. 91A.

power to make laws, conferred upon it by a constitution like that of Massachusetts." *Corning Glass Works* v. *Ann & Hope, Inc.*, 363 Mass. 409, 421 (1973), quoting from *Brodbine* v. *Revere*, 182 Mass. 598, 600 (1903). See *Arno* v. *Alcoholic Beverages Control Comm'n*, 377 Mass. 83, 85 (1979); *Arlington* v. *Board of Conciliation & Arbitration*, 370 Mass. 769, 775 (1976). However, the Legislature may delegate to a board or executive officer the implimentation of the details of a policy adopted by the Legislature. *Id.* See *Consolidated Cigar Corp.* v. *Department of Pub. Health*, 372 Mass. 844, 850 (1977); *Corning Glass Works, supra*; *Massachusetts Bay Transp. Auth.* v. *Boston Safe Deposit & Trust Co.*, 348 Mass. 538, 544 (1965); *Opinion of the Justices*, 334 Mass. 721, 743 (1956); *Opinion of the Justices*, 330 Mass. 713, 719 (1953); *Commonwealth* v. *Hudson*, 315 Mass. 335, 341 (1943). Any such legislative delegation must indicate clearly the policy adopted by the General Court. The agency must be able to find "general guidance in the purposes and over-all scheme of the statute." *Opinion of the Justices*, 368 Mass. 831, 834 (1975). See *Opinion of the Justices*, 334 Mass. 721, 743 (1956).

We conclude, in light of these principles, that, as to flats generally and as limited to vestigial rights in submerged land as to which an ownership interest has already been acquired lawfully by legislative authorization, the standards to guide the Secretary are constitutionally adequate to define the limits of his exercise of the authority that would be delegated to him by Senate No. 1001.

*The Six Questions*

*Questions One and Two.* The first two questions seek the opinion of the Justices as to the application of the bill as proposed. The question of the effect of a statute and its future application is difficult to determine and not within the constitutional power of the Justices to answer. Our duty regarding opinions to a branch of the Legislature is both defined and limited by the Constitution, Part II, c. 3, art. 2, as

amended by art. 85 of the Amendments to the Massachu-
setts Constitution: "Each branch of the legislature, as well
as the governor or the council, shall have authority to re-
quire the opinions of the justices of the supreme judicial
court, upon important questions of law, and upon solemn
occasions." In interpreting this provision, we have said
that, "[w]hile it is our duty to render opinions in all those
cases in which . . . the Legislature . . . may properly re-
quire them, it is not the less our duty, in view of the careful
separation of the executive, legislative, and judicial depart-
ments of the government, to abstain from doing so in any
case which does not fall within the constitutional clause
relating thereto." *Answer of the Justices*, 319 Mass. 731,
733-734 (1946), quoting from *Answer of the Justices*, 150
Mass. 598, 601 (1890). See *Answer of the Justices*, 362
Mass. 914, 916-917 (1973).

We have repeatedly said that a request for an opinion re-
garding the effect or construction of a statute is not an "im-
portant question of law" or a "solemn occasion" within the
meaning of the Constitution, Part II, c. 3, art. 2. See, e.g.,
*Answer of the Justices*, 373 Mass. 867, 871 (1977); *Answer
of the Justices*, 319 Mass. 731, 734-735 (1946); *Answer of
the Justices*, 148 Mass. 623, 625-627 (1889); *Answer of the
Justices*, 122 Mass. 600, 602 (1877).

We have no means of summoning before us the parties
who may be affected by our opinion, and we do not have
the benefit of argument based on a factual record. See
*Answer of the Justices*, 122 Mass. 600, 603 (1877). "Al-
though such an opinion has not the force of an adjudication,
yet it is, in a sense, a prejudgment of the question proposed,
and would usually be followed by the subordinate judicial
officers of the Commonwealth; and any inhabitant inter-
ested in the question might well feel that his rights had been
impaired by it without giving him an opportunity to be
heard." *Answer of the Justices*, 148 Mass. 623, 625 (1889).
Further, anything we say as to the construction of the
statute would in no way affect the power of the Legislature
to pass any bill it sees fit to pass, or to declare the bill's in-

tended meaning, within the limits of the Constitution. *Answer of the Justices*, 319 Mass. 731, 735 (1946). *Answer of the Justices*, 148 Mass. 623, 627 (1889).

Although our discussion earlier in this reply may be of assistance in resolving particular questions arising under the proposed act, the boundaries set by the Constitution on our duty to furnish opinions are jurisdictional in nature and "must be strictly observed in order to preserve the fundamental principle of the separation of the judicial from the executive and the legislative branches of government." *Answer of the Justices*, 362 Mass. 914, 917 (1973). We therefore respectfully ask to be excused from answering questions one and two.

*Question Three.* Question three deals generally with the constitutionality of the proposed act under the Fourteenth Amendment to the Constitution of the United States and art. 10 of the Declaration of Rights of the Constitution of the Commonwealth guaranteeing due process and equal protection of the laws. Question three presents no specific point. "[I]t 'has always been the practice for the Justices to confine their answers to particular questions of law submitted to them and not to discuss a broad inquiry as to the constitutionality of a proposed statute in its entirety. *Opinion of the Justices*, 145 Mass. 587, 592 [1887]; 239 Mass. 606, 612 [1921]; 261 Mass. 556, 613 [1927].' *Opinion of the Justices*, 297 Mass. 559, 566-567 [1937]. In accordance with this established practice, we do not attempt a broad inquiry as to the constitutionality of the pending bill in its entirety." *Opinion of the Justices*, 320 Mass. 773, 782 (1946). See *Opinion of the Justices*, 349 Mass. 794, 801 (1965).

In general terms, in light of the discussion set forth earlier, we can state that in the relinquishment of the Commonwealth's residual interests in tidelands in Boston, the bill, as construed by us, if enacted into law, would not contravene due process of law guarantees of the Fourteenth Amendment to the Constitution of the United States or art. 10 of the Declaration of Rights. Equal protection guarantees depend on factual circumstances not presented to us.

The classifications made by the 1980 Line and the limitation of the act to tidelands in the city of Boston, however, are not on their face arbitrary or irrational. *Pinnick* v. *Cleary*, 360 Mass. 1, 28 (1971).

We answer question three in the negative in general terms as to due process of law considerations and, for the reasons stated in our response to questions one and two, beg to be excused from answering it as to equal protection principles.

*Question Four.* In view of our previous discussion of the applicable principles of law and of the provisions of the proposed act, the bill, if enacted into law, would not exceed the powers of the General Court and, therefore, would not be in contravention of Part II, c. 1, § 1, art. 4 of the Constitution of the Commonwealth to make "all manner of wholesome and reasonable . . . laws." We have expressed concerns about the proper interpretation of the scope of certain portions of the proposed act and have recognized the possibility that in certain applications the proposed act might not comport with constitutional requirements concerning the disposition of the Commonwealth's interest in certain tidelands, particularly present or former submerged land lying seaward of the 1980 Line. But, subject to these concerns, we answer question four, "No."

*Question Five.* Question five asks whether art. 97 of the Articles of Amendment to the Massachusetts Constitution would require a two-thirds vote of both branches of the General Court in order to enact Senate No. 1001. Article 97, which was approved on November 7, 1972, amended art. 49 of the Amendments to the Massachusetts Constitution. Article 97 is an environmental protection provision which states that "[t]he people shall have the right to clean air and water, freedom from excessive and unnecessary noise, and the natural, scenic, historic, and esthetic qualities of their environment; and the protection of the people in their right to the conservation, development and utilization of the agricultural, mineral, forest, water, air and other natural resources is hereby declared to be a public purpose." Article 97 authorizes the Legislature to acquire

"lands and easements or such other interests therein as may be deemed necessary to accomplish these purposes." As most pertinent to the question propounded, art. 97 provides that "[l]ands and easements taken or acquired for such purposes shall not be used for other purposes or otherwise disposed of except by laws enacted by a two thirds vote, taken by yeas and nays, of each branch of the general court." Our inquiry, then, is whether Senate No. 1001 authorizes a different use or otherwise disposes of "[l]ands and easements taken or acquired" for purposes set forth by art. 97.

We believe that lands and easements taken or acquired for purposes described in art. 97 includes property acquired prior to the effective date of the 1972 amendment. See Rep. A.G., Pub. Doc. No. 12, at 139, 141 (1973). "To claim that new Article 97 does not give the same care and protection for all these existing public lands as for lands acquired by the foresight of future legislators or the generosity of future citizens would ignore public purposes deemed important in our laws since the beginning of our Commonwealth. Moreover, if this amendment were only prospective in effect, it would be virtually meaningless." *Id.* The two-thirds voting requirement applies to the disposition of all lands and easements taken or acquired for the stated purposes, regardless of when they were taken or acquired. We would include, within the word "acquired," interests of the Commonwealth acquired by the sovereign pursuant to colonial charter and the adoption of the Constitution of the Commonwealth. It is possible that public interests in tidelands which may be affected by Senate No. 1001 were acquired for purposes contemplated by art. 97, that is, for the "conservation, development and utilization" of the city's water and natural resources.

We observe that, while paragraph three of art. 97 authorizes the acquisition of lands, easements, *and other interests* in lands, the two-thirds vote requirement of paragraph four applies only to the disposal of lands and easements. We do not treat the omission of lesser property rights from the two-thirds voting requirement as accidental or meaningless where

the particular language occurs in two consecutive para-
graphs.

We think it is clear that Senate No. 1001 is not involved
with the disposition of lands of the Commonwealth. While
it is clear that not all the Commonwealth's interests in tide-
lands amount to easements, see, e.g., *Boston Waterfront,*
*supra* at 649-651; *Dyer* v. *Siano,* 298 Mass. 537, 539-540
(1937), and that any disposition of such interests is not sub-
ject to the two-thirds voting requirements of art. 97, Senate
No. 1001 makes no distinction between those tidelands as to
which the Commonwealth possesses an easement and those
as to which it possesses lesser interests. We have expressed
doubt whether any easement in favor of the Common-
wealth is involved in Senate No. 1001. However, since we
do not know whether any interest of the Commonwealth in
the parcels of land proposed to be affected by the act may be
characterized as an easement, we are unable to answer
question five with confidence. If any interest which is or
might be relinquished pursuant to the proposed act is an
easement, a two-thirds vote is required as to the relinquish-
ment of that easement. We therefore answer question five,
"Yes," as to the disposition of any land or easement.

*Question Six.* Question six concerns the application of
art. 97 of the Amendments and of art. 30 of the Declaration
of Rights concerning the separation of powers. It asks
whether Senate No. 1001 is "an unlawful delegation of
legislative power and responsibility to regulate the public
trust over certain tidelands in violation of Article XCVII
[art. 97 amending art. 49] or Article XXX of Part the First of
the Constitution of the Commonwealth."

Section 4 of proposed G. L. c. 91A authorizes the Secre-
tary of the Executive Office of Environmental Affairs to
release and extinguish vestigial rights of the Commonwealth
in tidelands in Boston seaward of the 1980 Line if the Secre-
tary finds that the present or proposed use will serve a prop-
er public purpose and will not be detrimental to the public
navigation of the remaining waters of Boston Harbor. The
bill identifies the land as to which the Secretary may act —

tidelands in Boston in which a record owner has a lawful interest and in which the Commonwealth has or may have vestigial rights. The intention is to permit the public interest to be served by relinquishing those vestigial rights so that titles may be marketable and so that the property may be put to constructive uses without fear of the Commonwealth's asserting some residual interest. We think the property has been adequately identified in the circumstances, the interest to be surrendered has been sufficiently recognized, and the proper purposes to which the property may be put have been adequately acknowledged. The Secretary is given sufficient guidance for the exercise of the legislative policy. There would be no unlawful delegation of the Legislature's responsibility.

We see no limitation in art. 97 on the right of the Legislature to delegate to an administrative official or agency the authority to dispose of lands and easements taken or acquired for the purposes stated in art. 97, provided the delegating act sets forth clearly the legislative purpose and policies and provides reasonable standards to be applied.

We answer question six, "No."

*Conclusion*

We beg to be excused from answering questions one and two.

Our answer to question three is, "No," in general terms as to due process of law considerations. We beg to be excused from answering question three as to equal protection of the law principles.

Our answer to question four is, "No," subject to the concerns expressed in our discussion of this question.

Our answer to question five is, "Yes," but only as to the disposition of any land or easement within the scope of art. 97 of the Amendments.

Our answer to question six is, "No."

The foregoing answers and opinions are submitted by the Chief Justice and Associate Justices subscribing hereto on the 18th day of June, 1981.[8]

EDWARD F. HENNESSEY
ROBERT BRAUCHER
HERBERT P. WILKINS
JOSEPH R. NOLAN
NEIL L. LYNCH

The separate opinion of Justices Liacos and Abrams begins at page 923, following Appendix A.

---

[8] We are today submitting answers to substantially identical questions propounded to us by the Senate concerning a somewhat similar bill (House No. 658).

Opinions of the Justices.

APPENDIX A

We subscribe to much of the careful formulation of views our brethren express in their advisory opinion as to House No. 658 and as to Senate No. 1001. It seems to us that a careful reading of both advisory opinions leads first to the conclusion that as to land lying landward of the 1980 Line, a proper public purpose has been declared as the basis of extinguishing whatever vestigial rights may exist in what once were tidal flats. We agree with this conclusion. Second, since House No. 658 involves no conveyance of public rights for land seaward of the 1980 Line and gives adequate recognition to "public trust rights," we agree with our brethren that House No. 658 is not constitutionally proscribed. We disagree, however, with the essence of what our brethren have set forth in both advisory opinions in the section entitled "General Considerations" in so far as it pertains to submerged lands.[1] While we are comforted by the limitations implied by our brethren as to this so called "authority to surrender" of the Legislature,[2] we are unable to agree that the Legislature may surrender or destroy the public rights in submerged lands.

We are of the opinion that as to land lying seaward of the 1980 Line, Senate No. 1001 is beyond the authority of the Legislature to enact in its present form because (1) the Commonwealth may not convey submerged lands so as absolutely to defeat the public's inalienable trust rights in that property; (2) as to such property, the Legislature may convey such land only for a public purpose, conditioned on its use for the declared purpose, and only after imposing any necessary conditions and making specific findings that such conveyances will not impair the remaining trust rights; and (3) such legislation must meet the requirements of the "prior public use" doctrine.

---

[1] "In our opinion, the Legislature has authority to surrender any so called vestigial or residual public rights in lawfully filled, formerly submerged, land." *Opinion of the Justices, supra* at 904.

[2] "[A] gross or egregious disregard of the public interest would not survive constitutional challenge." *Opinion of the Justices, supra* at 903-904. See also *supra* at 903-904.

If the Legislature purports to make a grant in fee simple of lands lying below the low water line, the grantee's title is "subject to the condition subsequent that it be used for the public purpose for which it was granted," *Boston Waterfront Dev. Corp.* v. *Commonwealth*, 378 Mass. 629, 649 (1979), or some new public purpose approved by the Legislature. Therefore, as to lands lying below the low water mark, the public's interest in the trust property may not totally be abridged, but the public use may be modified and adapted to meet contemporary public purposes. See *Long Beach* v. *Mansell*, 3 Cal. 3d 462, 482-486 (1970). While the power to respond to changed conditions resides in the Legislature, the new use must continue to serve a public purpose. *Robbins* v. *Department of Pub. Works*, 355 Mass. 328, 330 (1969). *Gould* v. *Greylock Reservation Comm'n*, 350 Mass. 410, 419 (1966). *Lowell* v. *Boston*, 111 Mass. 454, 462 (1873).

The declaration in Senate No. 1001 that public purpose may be defined as "any commercial, industrial, business, residential [*sic*] conservation or other purpose for which real estate has been, could now be, or may in the future be lawfully used" flies in the face of long-established precedent that public property must be used for a public purpose, and that the Legislature must determine the propriety of the new public use.[3] Clearly, the words "public purpose" have been considerably broadened over the years. See *Massachusetts Home Mortgage Fin. Agency* v. *New England Merchants Nat'l Bank*, 376 Mass. 669, 676-684 (1978). Cf. *Salisbury Land & Improvement Co.* v. *Commonwealth*, 215 Mass. 371 (1913); *Lowell* v. *Boston*, 111 Mass. 454, 460-461 (1873).

There is no support in our case law, however, for a definition which permits the public purpose to be defined by the

---

[3] In determining public purpose the court said that one of the factors which should be considered is "whether a proposed extension of governmental activity is in line with the historical development of the Commonwealth and with the general purpose of its founders." *Allydonn Realty Corp.* v. *Holyoke Hous. Auth.*, 304 Mass. 288, 293 (1939).

use made of the property by private developers. A delegation to private parties to determine the public purpose for the use of public trust land is an unlawful delegation of the Legislature's obligation to make the determination that public trust lands are being conveyed for a proper public purpose. See generally *Corning Glass Works* v. *Ann & Hope, Inc.*, 363 Mass. 409, 420-424 (1973).

The definition in Senate No. 1001 attempts to ratify existing uses and thereby achieve by indirection nullification of the requirement that public property be conveyed only for public purposes. The bill's definition of public purpose will make ownership so absolute as to permit private persons to change the nature of the use without any consideration of public purpose. It diverts the public's interest to private ends and private uses. It amounts to a gift of the public interest to private persons. Such a result is beyond the power of the Legislature.

The Legislature may modify the use of public lands; "[l]and appropriated to one public use cannot be diverted to another inconsistent public use without plain and explicit legislation to that end." *Sacco* v. *Department of Pub. Works*, 352 Mass. 670, 672 (1967), quoting from *Higginson* v. *Treasurer & School House Comm'rs of Boston*, 212 Mass. 583, 591 (1912). *Gould* v. *Greylock Reservation Comm'n, supra* at 421. See generally Sax, The Public Trust Doctrine in National Resource Law: Effective Judicial Intervention, 68 Mich. L. Rev. 471, 491-502 (1970). "[I]t is essential to the expression of plain and explicit authority to divert parklands, Great Ponds, reservations and kindred areas to a new and inconsistent public use that the Legislature identify the land and that there appear in the legislation not only a statement of the new use but a statement or recital showing in some way legislative awareness of the existing public use. In short, the legislation should express not merely the public will for the new use but its willingness to surrender or forgo the existing use." *Robbins* v. *Department of Pub. Works, supra* at 331. The bill fails to comply with the specificity requirement of the prior public use doctrine.

Lastly, to the extent that there is dictum in earlier cases that the public trust rights in submerged lands could be conveyed to private owners, those cases were not concerned with legislation to convey submerged lands impressed with a public trust to private persons for private uses. We conclude that Senate No. 1001, as presently drafted, would be constitutionally invalid. In our view, the appropriate response to questions 4 and 6 is, "Yes."

The foregoing answers and opinion are submitted by the Justices subscribing hereto on the eighteenth day of June, 1981.

PAUL J. LIACOS
RUTH I. ABRAMS